**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE,<br><br>        Plaintiff,<br><br>                v.<br><br>UNITED STATES DEPARTMENT OF<br>COMMERCE,<br><br>        Defendant. | Civ. A. No. 19-0778 (CJN) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cause of Action Institute ("Plaintiff") filed this civil action against defendant United States Department of Commerce ("DOC"), alleging that DOC violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in connection with a request for access to information made by Plaintiff.   Specifically, Plaintiff requested access to:

> a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.

Declaration of Brian D. Lieberman ("Lieberman Decl.") ¶ 8, Exs. 1, 2.

The document at issue is a report that the Secretary of Commerce ("Secretary") submitted to President Donald J. Trump on February 19, 2019, pursuant to Section 232 of the Trade Expansion Act of 1962 ("Trade Expansion Act"), 19 U.S.C. § 1862 ("Section 232") regarding whether automobile and certain automobile part imports threaten to impair the national security of the United States ("Automotive Report").   *Id.* ¶ 6.

Specifically, Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, requires the Secretary of Commerce ("Secretary"), under certain enumerated circumstances triggered here, to "immediately initiate an appropriate investigation to determine the effects on the national security of imports of [any] article which is the subject of such request, application, or motion." 19 U.S.C. § 1862 (b)(1)(A).  Within 270 days of initiating such investigation, the Secretary must report his findings and make recommendations to the President. 19 U.S.C. § 1862 (b)(3)(A).

Within 90 days after receiving a report from the Secretary finding affirmatively that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is required to determine whether he concurs with that finding and, if so, "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article[s]" such that they "will not threaten to impair the national security."  19 U.S.C. § 1862 (c)(1)(A).  Among other ways to mitigate the risk to national security, the President may pursue "the negotiation of an agreement which limits or restricts importation into, or the exportation to, the United States of the article that threatens to impair national security."  19 U.S.C. § 1862 (c)(1)(A)(i).  If, after 180 days, a negotiated agreement is not achieved or an agreement reached proves ineffectual, the President shall take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862 (c)(1)(A)(i)(I-II).

In this case, Secretary initiated an investigation into the impact of the importation of automobile and certain automotive on national security at the President's request and, on February 17, 2019, reported his findings and recommendations (the Automotive Report that is the subject of this dispute) to the President as required by Section 232.  Following his review of the

Automotive Report, on May 17, 2019, the President issued an Executive Proclamation summarizing and concurring with the Secretary's findings that the importation of the targeted products threatens to impair national security and adopting the Secretary's recommendation that the United States seek to negotiate agreements intended to adjust automobile and automobile part imports so as to eliminate this threat.   The President directed the United States Trade Representative ("USTR") to conduct these negotiations and report back to him by November 13, 2019 (the 180 days allotted by statute), at which time the President will determine what additional action, if any, he deems necessary in accordance with Section 232.  Lieberman Decl., at ¶ 6.

As the accompanying Lieberman Declaration demonstrates,[1] DOC properly withheld the Automotive Report in its entirety pursuant to the presidential communications and deliberative process privileges under FOIA Exemption 5.  Thus, there is no genuine issue of material fact and DOC is entitled to judgment as a matter of law.

## STANDARD OF REVIEW FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, the trier of fact must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party must show that the dispute is genuine and material to the case.  A "genuine issue" is one whose factual dispute is capable of affecting the substantive outcome of the case and is supported by admissible evidence that a reasonably trier of fact could find for the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 247-48 (1986). The burden on the moving party may be discharged by showing that there is an absence of

---

[1] The Lieberman Declaration describes the nature of the withholding.

evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011). In a FOIA action, an agency that moves for summary judgment "bears the burden of showing that there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester." *Weisberg v. U.S. Dep't of Justice*, 705 F. 2d 1344, 1350 (D.C. Cir. 1983). An agency can meet its burden by submitting declarations or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Summary judgment is justified in a FOIA lawsuit once the agency demonstrates that no material facts are in dispute and, if applicable, that each document that falls within the class requested either has been produced, is unidentifiable, or is exempt from disclosure. *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001).

## ARGUMENT

### A.   DOC Did Not Violate FOIA Because It Properly Withheld an Exempt Document.

FOIA requires federal agencies to release all records responsive to a request for production unless a specific exemption is applicable. 5 U.S.C. § 552(a)(3)(A), (4)(B); 5 U.S.C. § 552(b). It allows agencies to withhold only those documents that fall under one of nine specific exemptions. *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).

FOIA recognizes that the release of certain information "may harm legitimate governmental or private interests." *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). To this end, the statute contains nine exemptions that permit an agency to withhold responsive information. 5 U.S.C. § 552(b)(1)-(9). Moreover, as the Supreme Court recently observed, "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure

requirement." *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (citations omitted).

When an agency makes a withholding pursuant to a FOIA exemption, the agency must explain the exemption(s) claimed and the applicability of the exemption(s). *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 753 (1989). "In a FOIA case, the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Labor,* 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). Ultimately, if an agency's justifications for invoking a FOIA exemption are logical or plausible, then the agency is entitled to summary judgment. *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007).

DOC properly withheld the Automotive Report because it is protected from disclosure by both the presidential communications privilege and the deliberative process privilege pursuant to FOIA Exemption 5.   Lieberman Decl. ¶¶ 11-12, 34-43.

**B.      DOC Properly Withheld the Automotive Report Pursuant to Exemption 5.**

**1.      *The Automotive Report Constitutes an Inter-Agency or Intra-Agency Memorandum.***

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5).  It covers the presidential communications privilege, the deliberative process

privilege, and the attorney-client privilege. *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1109 (D.C. Cir. 2019).

To qualify for Exemption 5, the agency must first establish that the withheld document is an inter-agency or intra-agency memorandum or letter.   As we now show, the Automotive Report – commissioned, in all practical respects, by the Executive Office of the President from the Department of Commerce – is an "inter-agency or intra-agency memorandum or letter."

Under several enumerated circumstances, the Trade Expansion Act requires the Secretary to initiate an investigation "to determine the effect on the national security of imports of" any article of commerce under several enumerated circumstances, including upon his own motion or at the request of the President. *See* 19 U.S.C. § 1862(b)(1)(A).  On May 23, 2018, the President made such a request, triggering the Secretary's statutory obligation to conduct the above-described investigation:

> "Today, I met with Secretary of Commerce Wilbur Ross to discuss the current state of our automobile industry.  I instructed Secretary Ross to consider initiating a Section 232 investigation into imports of automobiles, including trucks, and automotive parts to determine their effects on America's national security.  Core industries such as automobiles and automotive parts are critical to our strength as a Nation."

*Statement from the President on Potential National Security Investigation into Automobile Imports*, Lieberman Decl. ¶ 23, Ex. 6.  Consequently, the Secretary formally announced the initiation of the investigation a week later on May 30, 2018. *Id*. ¶ 24.

Investigations initiated under the statute are required to culminate in a report advising the President whether the importation of the targeted products constitutes a threat to national security and providing recommendations for action or inaction.  19 U.S.C. § 1862(b)(3)(A).  Consistent with that requirement, the Secretary submitted the Automotive Report to the President on February 17, 2019.  A communication containing advisory and informative material and coming from one

executive agency (DOC) to another (the Executive Office of the President), the Automotive Report

is an inter-agency memorandum.

2.      *The Automotive Report Is Exempt Pursuant to the Presidential Communications Privilege.*

Exemption 5 has been construed to incorporate the presidential communications privilege.

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (citing *NLRB v.*

*Sears, Roebuck & Co.*, 421 U.S. 132, 149 n. 16(1975)).  This privilege "protects documents or

other materials that reflect presidential decision-making and deliberations that the President

believes should remain confidential." *Elec. Privacy Info. Ctr. ("EPIC") v. Dep't of Justice*, 320

F. Supp. 3d 110, 115 (D.D.C. 2018) (quoting *In re Sealed Case*, 121 F.3d 729, 745 (D.C. Cir.

1997)).  "[G]iven the need to provide sufficient elbow room for advisers to obtain information

from all knowledgeable sources, the privilege must extend beyond communications made directly

to the President to include all communications solicited and received by the President's immediate

advisers or even certain members of their staff." *Judicial Watch*, 913 F.3d at 1111 (quoting *In re*

*Sealed Case*, 121 F.3d at 752).  The privilege's reach is inherently broad, "apply[ing] to documents

in their entirety and covers final and post-decisional materials as well as pre-deliberative ones."

*EPIC*, 320 F. Supp. 3d at 115 (quoting *In re Sealed Case*, 121 F.3d at 745).

It is well settled that an agency has the authority to apply the presidential communications

under FOIA.  *See*, *e.g.*, *EPIC*, 320 F. Supp. 3d at 117 ("[T]he Court is persuaded by earlier

decisions from this District that an agency has the authority to invoke the presidential

communications privilege when making FOIA Exemption 5 holdings..[and] concludes that the

Department has adequately invoked the privilege without any action by the President or his staff");

*Am. Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 309 (D.D.C. 2018)("the

presidential communications privilege does not need to be asserted by the President himself");

*EPIC v. Dep't of Justice*, 584 F. Supp. 2d 65, 80 (D.D.C. 2008) (holding Department could invoke the presidential communications privilege under FOIA). The privilege need not be invoked by a senior official. Rather, the agency must "simply make[] the determination that [the document] is protected from disclosure." *Am. Ctr. for Law & Justice*, 330 F. Supp. 3d at 309 (citing *Lardner v. Dep't of Justice*, Civ. A. No. 03-0180 (JDB), 2005 WL 758267 at *8 (D.D.C. Mar. 31, 2005). Here, DOC determined the presidential communications privilege applied in response to Plaintiff's FOIA request for the Automotive Report. Lieberman Decl., at ¶¶ 7, 10, 11, & Ex. 5. Therefore, DOC has properly invoked the privilege.

The presidential communications privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution because it relates to the effective discharge of a President's powers." *Judicial Watch*, 913 F.3d at 1110 (quoting *United States v. Nixon*, 418 U.S. 683, 708, 711 (1974)). It serves to "protect[] the public interest candid, objective and event blunt or harsh opinions in Presidential decision-making." *Id.* "The scope of the presidential communications privilege is thus defined in terms of communications that involve the Office of the President, the exercise of the President's responsibilities and confidential presidential decision-making." *Id.* (quoting *Nixon v. Adm'r of Gen Servs.,* 433 U.S. 425, 449 (1977)).

The Automotive Report fits within the scope of this privilege. It consists of DOC's analysis of industry, market, economic, statistical and other types of data and information from government and non-government sources, the findings based on this analysis, and the Secretary's recommendations for action. Lieberman Decl. ¶¶ 37-39. This information, analysis and advice is aimed at assisting the President in the discharge of his consequential responsibilities protecting national security as described by the Act. Given the Secretary's affirmative findings and

conclusions, the President must both decide whether he concurs with the Secretary's findings and, if so, determine the "nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article[s] . . . so that such imports will not threaten to impair the national security." 19 U.S.C. §1862(c)(1)(A), (i-ii). The Automotive Report reflects information and advice that is at the heart of presidential decision-making.

This Court in *EPIC*, 320 F. Supp.3d at 110, recognized the application of the presidential communications privilege to a Justice Department report on the use of predictive analytics or law enforcement purposes that was prepared at the request of the White House Counsel's Office:

> "I agree with the Department of Justice that the Report enjoys protection from disclosure as a communication 'solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.'"

*Id*. at 116 (quoting *In re Sealed Case*, 121 F.3d at 750).

Here, the nexus is even tighter: it was the President, himself, who asked the Secretary to initiate a Section 232 investigation into automobiles and automobile parts. Lieberman Decl. ¶ 23. A week later, on May 30, 2018, the Secretary announced the investigation with the publication of a notice in the Federal Register seeking public comments and scheduling a public hearing. *Id*. ¶ 24, Ex. 7. Subsequently, on May 17, 2019, the President issued a Proclamation concurring with, among other things, the Secretary's conclusion that "automobile and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States." *Id.* ¶ 26, Ex. 8 ¶ 12. Moreover, the President adopted the Secretary's recommendation to pursue the negotiation of agreements with the European Union, Japan and other countries and directed the United States Trade Representative ("USTR") to pursue these negotiations and update him on their outcome. *Id.* ¶¶ 25-30, 32. This

first-level response has until November 13, 2019 to be implemented and its efficacy evaluated. *See* 19 U.S.C. §1862(c)(3)(A)(ii)(I)(creating 180-day timetable).

The President's quiver is not limited to a single arrow, however.  If the negotiations do not bear fruit, or the agreements they produce "[are] not being carried out or [are] ineffective in eliminating the threat to national security posed by imports" of the targeted products by November 13, 2019, the President is required by Section 232 to "take such other and further actions as [he] deems necessary to adjust the imports of [the targeted products] so that such imports will not threaten to impair the national security."  *Id.* ¶ 32; *see also* 19 U.S.C. §1862(c)(3)(A).  In determining what future implements to deploy to eliminate the threat to national security should the initial efforts to address the harm prove unavailing, the Automotive Report—reflecting the Secretary's findings and considered recommendations—continues to be a crucial blueprint for the President and his advisers to use in tackling the unabated threat.  In addition to the risk of inhibiting the kind of candor necessary to sound decision-making, requiring disclosure of the Automotive Report before the threat it was designed to help the President combat has been eliminated could impede the exercise of his statutory responsibility under Section 232.  Lieberman Decl. ¶ 39.

Accordingly, because the Automotive Report consists of advice solicited and received by the President for use in connection with his statutory responsibility to adjust the importation of the targeted products to protect the national security is privileged under the presidential communication privilege, DOC's invocation of Exemption 5 should be upheld.

   **3.**      ***The Automotive Report Is Exempt Pursuant to the Deliberative Process Privilege.***

The Automotive Report is also exempt from release under FOIA pursuant to the deliberate process privilege.  The purpose of the deliberative process privilege is to protect the government's decision-making process.  Among other things, the privilege "rests on the obvious realization that

officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001); *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (noting that the privilege "reflect[s] the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to' operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible"). Application of the privilege, therefore, serves to prevent injury to the quality of agency decisions." *Nat'l Labor Relations Bd. ("NLRB") v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-51 (1975).

To qualify for protection under the deliberative process privilege, the agency must show that the information is both (1) "pre-decisional" and (2) "deliberative." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002). A document is pre-decisional if "it was generated before the adoption of an agency policy," and deliberative if "it reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The privilege applies to documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB*, 421 U.S. at 150; *Coastal States*, 617 F.2d at 866 (deliberative process privilege protects documents "which would inaccurately reflect or prematurely disclose the views of the agency"). "Pre-decisional" documents exempt from release are not only those circulated within a single agency but include views submitted by one agency to another that has final decisional authority. *See, e.g, Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975).

By definition, any report produced pursuant to Section 232 is pre-decisional. It precedes, and is designed to inform, presidential decision-making as the statutory scheme makes plain.

Under Section 232, the Secretary initiates an investigation, makes findings and recommendations, and issues a report to the President.  Only then is the President called upon to act: deciding whether to concur with a finding that imports "threaten to impair the national security" and, if so, determining "the nature and duration of the action" necessary to eliminate the threat.  In the instant exercise of his statutory obligation, the Secretary set forth in the Automotive Report DOC's analysis of data and information from DOC and other governmental and non-governmental sources, including proprietary sources, relating to whether automotive imports threaten to impair national security.  Lieberman Decl. ¶ 35.  Since the Secretary found a threat existed, he set forth specific recommendations for action to the President, to whom final decisional authority is statutorily committed.  Lieberman Decl. ¶¶ 6, 35, 41.  Thereafter, in reliance upon, and concurring with, the Automotive Report, the President took action.  *See* Lieberman Decl. at Ex. 8 ¶ 12. Consequently, the Automotive Report is pre-decisional.

The Automotive Report is also deliberative.  To be "deliberative," a communication must be "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."  *Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975).  By its very design, the report Section 232 requires just that:  that the Secretary express opinions and make recommendations to the ultimate decision-maker – the President.  19 U.S.C. §1862(b)(1)(3)(A).

The deliberative process privilege "'ensur[es] that persons in an advisory role would be able to express their opinions freely to agency decision-makers without fear of publicity."  . . . Such consultations are an integral part of its deliberative process; to conduct this process in public view would inhibit frank discussion of policy matters and likely impair the quality of decisions.'" *McKinley v. Bd. of Gov. of the Fed. Reserve Sys.*, 647 F.3d 331, 339-40 (D.C. Cir. 2011) (quoting *Ryan v. Dep't of Justice*, 617 F.2d 781, 789-90 (D.C. Cir. 1980)).  It also protects factual materials

that are closely intertwined with opinions, recommendations, and deliberations. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) ("[T]he legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process."); *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1538-39 (D.C. Cir. 1993).  Moreover, it protects "a compilation of factual material assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action." *EPIC*, 320 F. Supp. 3d at 120 (quoting *Montrose Chem Corp. v.* Train, 491 F.2d 63, 71 (D.C. Cir. 1974)).

As the Lieberman Declaration makes clear, the Automotive Report contains the evaluation of data and information, opinions and recommendations on actions to adjust the importation of automobiles and certain automobile parts to prevent the threatened impairment of national security. Because the President's first-level response to the national security threat posed by the targeted imports has yet to be completed, premature release of this deliberative information would harm the President's Section 232 decision-making process by revealing information pertinent to the USTR's ongoing negotiations and compromise any such further action the President may deem necessary.    Lieberman Decl. ¶¶ 22, 42.

Because DOC has withheld pre-decisional, deliberative information that is privileged under the deliberate process privilege, the agency's invocation of Exemption 5 should be upheld.

**C.**     **DOC Has Complied With FOIA's Segregability Requirement.**

Under the FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b).  Non-exempt portions of records need not be disclosed if they are "inextricably

intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).   To establish all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated.  *Armstrong v. Exec. Office of the President,* 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).

Here, DOC carefully reviewed and withheld the Automotive Report in its entirety because the exempt information was so inextricably intertwined with nonexempt information that any segregation would result in a meaningless set of words or phrases with no or minimal content. Lieberman Decl. ¶ 43.

Because DOC carefully reviewed the Automotive Report and determined no non-exempt information could be released, the Court should find the segregability requirement met.

## CONCLUSION

Accordingly, for the reasons set forth above and in the accompanying declaration, Defendant respectfully submits that this motion for summary judgment should be granted.

Respectfully submitted,
JESSIE K. LIU, D.C. Bar 472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar 924092
Chief, Civil Division

/s/_____
JOHN MOUSTAKAS, D.C. Bar 442076
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2518
John.Moustakas@usdoj.gov
*Attorneys for Defendants*