EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CAUSE OF ACTION INSTITUTE,

      Plaintiff,

         v.                           CASE NO. 19-cv-778 (CJN)

UNITED STATES DEPARTMENT OF
COMMERCE,

      Defendant.

---

## DECLARATION OF BRIAN D. LIEBERMAN

I, Brian D. Lieberman, do hereby declare, subject to 28 U.S.C. § 1746, that the following statements are true and correct, to the best of my knowledge and belief:

1.    I currently serve as Senior Counsel with the Information Law Division of the Office of the General Counsel for the United States Department of Commerce ("DOC" or "Department"). I have served in this position since January 2019. My responsibilities include advising the Department and its component agencies regarding requests submitted to the DOC Immediate Office of the Secretary ("IOS") for records made under both the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a, and litigation related to such requests. In this capacity, I routinely consult with the FOIA offices for the Department and agencies regarding requests.

2.    The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, upon

conclusions and determinations reached and made in accordance therewith, and upon my personal examination of the withheld and redacted documents. I am personally familiar with the FOIA request of Plaintiff Cause of Action ("Plaintiff"), which is at issue in this case.

3.    This Declaration is being submitted in support of DOC's Motion for Summary Judgment.

## Preliminary Statement

4.    Plaintiff made a request under FOIA for a copy of a report that the Secretary of Commerce ("Secretary") submitted to President Donald J. Trump pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, regarding whether automobile and certain automobile part imports threaten to impair the national security of the United States (the "Automotive Report").

5.    Section 232 authorizes the President to impose restrictions on certain imports based upon an affirmative determination by the Secretary that the targeted products are being imported into the United States "in such quantities or under such circumstances as to threaten or impair the national security." 19 U.S.C. § 1862.  The Secretary must initiate an investigation upon the request by the head of any department or agency, upon application of an interested party, or upon self-initiation.  *Id*. § 1862(b)(1)(A).

6.    In this case, the Secretary initiated an investigation into automotive imports at the President's request and on February 17, 2019, submitted the Automotive Report to the President as required by Section 232.  Following his review of the Automotive

Report, on May 17, 2019, the President issued an Executive Proclamation summarizing and concurring with the Secretary's findings that the importation of the targeted products threatens to impair national security and adopting the Secretary's recommendation that the United States seek to negotiate agreements intended to adjust automobile and automobile part imports so as to eliminate this threat.  The United States Trade Representative ("USTR"), whom the President directed to conduct these negotiations, must report back to the President by November 13, 2019 (which is 180 days from the issuance of this proclamation), at which time the President will determine what additional action, if any, he deems necessary in accordance with Section 232.

7.   DOC has determined that the Automotive Report is exempt from disclosure pursuant to the presidential communications privilege and/or the deliberative process privilege under FOIA Exemption 5, 5 U.S.C. § 552(b)(5).  The presidential communications privilege applies to the Automotive Report because the Secretary prepared it, at the President's behest, for the purpose of advising the President and his advisers, who received and reviewed the report and are using it in connection with the execution of the  President's strategy to adjust automotive imports under Section 232.  The deliberative process privilege applies because the Automotive Report, drafted by DOC and submitted to the President, consists of the analysis of economic, market, industry, statistical and other types of data and information by DOC for the President to consider in deciding what actions are required to adjust

the importation of these products so as to eliminate the threatened impairment of the national security.

**Plaintiff's FOIA Request**

8.  By correspondence dated February 18, 2019, Plaintiff submitted identical FOIA requests to the Bureau of Industry and Security ("BIS") and DOC seeking "a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts." (See Exhibits 1 and 2 respectively).

9.  By email dated February 19, 2019, BIS acknowledged receipt of the request and provided administrative tracking number DOC-BIS-2019-000742.[1] (See Exhibit 3).

10. By email dated February 25, 2019, BIS advised Plaintiff that Plaintiff's request for a waiver of the applicable fees was granted. (See Exhibit 4).

11. By correspondence dated June 13, 2019, a copy of which is attached as Exhibit 5, DOC advised Plaintiff that:

> We are currently reviewing, in conjunction with the Executive Office of the President, whether the Secretary's report constitutes a presidential record within the meaning of the Presidential Records Act, 44 U.S.C. 2201 et seq., in which case it would not be subject to disclosure under FOIA. However, to the extent that the Secretary's Section 232 report to the President of the United States may constitute an agency record within the meaning of FOIA, DOC and BIS are withholding it in full pursuant to 5 U.S.C. § 552(b)(5), which exempts from disclosure inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. The report, if an agency record, would be exempted from disclosure under FOIA pursuant to the presidential communications privilege and/or the deliberative process privilege, until all actions

---

[1] DOC did not separately send an acknowledgment of the identical request submitted to DOC. In its correspondence regarding both requests dated June 13, 2019, however, which is described in Paragraph 11, and attached as Exhibit 5, DOC identified the request to DOC by administrative tracking number DOC-IOS-2019-000827.

deemed necessary to adjust the imports of automobiles and automobile parts so that such imports will not threaten to impair the national security have been completed. See 15 C.F.R. § 705.11.

12.     Upon completion of this review, DOC concluded that the Automotive Report is

subject to the presidential communication privilege and/or the deliberative process

privilege pursuant to Exemption 5.

### Presidential Authority to Adjust Imports That Threaten to Impair the National Security Under Section 232.

13.     Section 232 authorizes the President, upon receipt of a report from the Secretary

finding that an "article is being imported into the United States [a] in such

quantities or [b] under such circumstances as to threaten to impair the national

security," to take actions that "in the judgment of the President" will "adjust the

imports of the article and its derivatives so that such imports will not threaten to

impair the national security." 19 U.S.C. § 1862(c)(1)(A).

14.     The President can take no action, however, without the Secretary first submitting

the report regarding an investigation of the targeted products. Specifically, under

Section  232, the Secretary must initiate an investigation upon the request by the

head of any department or agency, upon application of an interested party,  or upon

self-initiation. *Id.* § 1862(b)(1)(A).

15.     The statute additionally requires the Secretary to consult with the Secretary of

Defense and other United States officials, and, if appropriate, to hold public

hearings or otherwise afford interested parties an opportunity to present information

and advice relevant to the investigation. *Id.* § 1862(b)(2)(A).

16. Section 232 also sets forth particular matters that the Secretary must, "in the light of the requirements of national security and without excluding other relevant factors, give consideration," such as, *inter alia*, "domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, [and] existing and anticipated availability of the human resources, products, raw materials, and other supplies and services essential to the national defense..." *Id.* § 1862(d).

17. The Secretary has 270 days from the initiation date to prepare and submit to the President a report advising him on whether the importation of the targeted products constitutes a threat to national security and providing recommendations for action or inaction based upon the report's findings. *Id.* § 1862(b)(3)(A).

18. Once the President receives the report, he has 90 days to decide whether he concurs with DOC's finding and recommendations, and to determine the nature and duration of the action or actions he considers necessary to adjust the importation of the targeted products so they no longer threaten to impair national security. *Id.* § 1862(c)(1)(A). The President may implement the recommendations that DOC has suggested, take other actions or take no action.

19. One course of action available to the President is negotiation of an agreement to limit or restrict imports of the targeted products. If the agreement is not entered into within 180 days, or if "such an agreement that has been entered into is not being carried out or is ineffective in eliminating the threat to national security posed by imports" of the targeted products, the "President shall take such other actions as

the President deems necessary to adjust the imports of such [products] so that such

imports will not threaten to impair the national security." *Id.* § 1862(c)(3)(A)(i) and

(ii).

20.    Section 232 does impose certain publication requirements.  When the President

takes further action following unsuccessful efforts to negotiate an agreement or if

the agreement does not succeed in adjusting imports as intended, the President must

publish in the Federal Register notice of the additional actions taken.  *Id.* §

1862(c)(3)(A)(ii). Further, if, despite these circumstances, "the President

determines not to take any additional actions...the President shall publish in the

Federal Register such determination and the reasons for which such determination

is based.  *Id.* § 1862(3)(B).

21.    Section 232 also requires that the Secretary publish in the Federal Register "[a]ny

portion of the report submitted by the Secretary [to the President] which does not

contain classified information or proprietary information."  *Id.* § 1862(b)(3)(B).

Additionally, pursuant to the applicable regulations, "[a]n Executive Summary of

the Secretary's report . . . excluding any classified or proprietary information, shall

be published in the Federal Register.  Copies of the full report, excluding any

classified or proprietary information, will be available for public inspection and

copying in the [BIS] Freedom of Information Records Inspection Facility[.]"  15

C.F.R. §705.10 (c).    The statute and regulation, however, do not specify the time

at which the Secretary must make publicly available a Section 232 report.

22. The Secretary's report plays an integral role in the President's exercise of the broad authority granted to him under Section 232 in determining the actions the President deems necessary to adjust imports of the targeted products.   The statute makes the report, which embodies the Secretary's analysis and advice to the President, the lynchpin of presidential action.   DOC thus respectfully submits that, at a minimum, where the President has concurred with the Secretary's recommendations and directed the negotiation of an agreement or agreements to limit or restrict importation of the targeted products, the Secretary is not required to publish or otherwise make the report publicly available until such time as the President has resolved the negotiation of the agreement and/or "such other actions as the President deems necessary to adjust imports of such [targeted products] so that such imports will not threaten to impair the national security." Id. § 1862(c)(3)(A)(ii). To conclude otherwise would undermine the Secretary's advice to the President on matters of economic and national security memorialized in the report.

**The Application of Section 232 to the Import of Automobiles and Automobile Parts into the United States.**

23. On May 23, 2018, President Donald J. Trump, in a *Statement from the President on Potential National Security Investigation into Automobile Imports*, proclaimed:

Today, I met with Secretary of Commerce Wilbur Ross to discuss the current state of our automobile industry.  I instructed Secretary Ross to consider initiating a Section 232 investigation into imports of automobiles, including trucks, and automotive parts to determine their effects on America's national security.  Core industries such as automobiles and automotive parts are critical to our strength as a Nation.

(A copy of the President's statement is attached as Exhibit 6).

24.   A week later, on May 30, 2018, DOC formally announced the initiation of the
      investigation with the publication in the Federal Register of a *Notice of Request for
      Public Comments and Public Hearing on Section 232 National Security
      Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light
      Trucks, and Automotive Parts,* a copy of which is attached as Exhibit 7.

25.   Subsequently, on February 17, 2019, the Secretary submitted the Automotive
      Report to the President.  In the Automotive Report, following an exhaustive
      analysis, including a review of a body of economic, market, industry and statistical
      and other types of data and information from numerous governmental and non-
      governmental sources, DOC determined that these imports threatened to impair
      U.S. national security and recommended, *inter alia*, that the President pursue
      negotiations to obtain agreements that address this threatened impairment.

26.   Subsequently, on May 17, 2019, the President issued an Executive Proclamation
      entitled *Adjusting Imports of Automobiles and Automobile Parts Into the United
      States* (Proclamation), a copy of which is attached as Exhibit 8.

27.   The President first summarized the Secretary's conclusions.  He noted, for instance,
      that "the Secretary found American-owned automotive R&D are vital to national
      security.  Yet increases in imports of automobiles and automobile parts, combined
      with other circumstances, have over the past three decades given foreign-owned
      producers a competitive advantage over American-owned producers." (*Id*. at ¶ 3).
      Significantly, the data showed that "American-owned producers' share of the
      domestic automobile market has contracted sharply, declining from 67 percent

(10.5 million units produced and sold in the United States) in 1985 to 22 percent (3.7 million units produced and sold in the United States) in 2017. During the same time period, the volume of imports nearly doubled, from 4.6 million units to 8.3 million units. In 2017, the United States imported over 191 billion dollars' worth of automobiles." (*Id.* at ¶ 4).

28.   For such reasons, the President stated: "The Secretary found that these imports are 'weakening our internal economy' and that '[t]he contraction of the American-owned automotive industry, if continued, will significantly impede the United States' ability to develop technologically advanced products that are essential to our ability to maintain technological superiority to meet defense requirements and cost effective global power projection." (*Id.* at ¶ 8).

29.   The President also pointed out the various factors that the Secretary thought could adversely affect American-owned automobile production in the near future: "the extent to which import penetration has displaced American-owned production, the close relationship between economic welfare and national security, see 19 U.S.C. 1862(d), the expected effect of the recently-negotiated United States-Mexico-Canada Agreement (USMCA), and what would happen should the United States experience another economic downturn comparable to the 2009 recession." (*Id.* at ¶ 10).

30.   Concurring with the Secretary's findings, the President adopted the Secretary's recommendation to pursue negotiations to adjust automotive imports to ensure they will not threaten to impair national security. (*Id.* at ¶¶ 11 and 12).

31.   The President next set forth his broad discretion under this statute:

> Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the
> President to take such action to adjust the imports of an article and its derivatives
> that are being imported into the United States in such quantities or under such
> circumstances as to threaten to impair the national security.  If that action is the
> negotiation of an agreement contemplated in 19 U.S.C. 1862(c)(3)(A)(i), and such
> an agreement is not entered into within 180 days of the proclamation or is not being
> carried out or is ineffective, then the statute authorizes the President to take other
> actions he deems necessary to adjust imports and eliminate the threat that the
> imposed article poses to national security.  See 19 U.S.C. 1862(c)(3)(A).

(*Id*. at ¶ 14).

32.   The President ordered the USTR to "pursue negotiations of agreements
contemplated in 19 U.S.C. § 1862(c)(3)(A)(i) to address the threatened impairment
of the national security with respect to imported automobiles and  certain
automobile parts from the European Union, Japan and any other country the
[USTR] deems appropriate,  and to update me on the progress of such negotiations
within 180 days."  (*Id*. at ¶ 15; see also (1) and (2)).

33.   The President also directed the Secretary to "continue to monitor imports of
automobiles and certain automobile parts,"  and "from time to time, in consultation
with any senior executive branch officials the Secretary deems appropriate, review
the status of such imports with respect to national security."   Additionally, the
Secretary must "inform the President of any circumstances that in the Secretary's
opinion might indicate the need for further action by the President under section
232…"  (*Id*. at (3)).

### JUSTIFICATION FOR THE WITHHOLDING OF
### THE AUTOMOTIVE REPORT PURSUANT TO
### FOIA EXEMPTION 5

34.   Exemption 5 protects "interagency or intra-agency memorandums or letters which
      would not be available by law to a party other than an agency in litigation with the
      agency." 5 U.S.C. § 552(b)(5).  Exemption 5 has been construed to exempt
      documents or information normally privileged in the civil discovery context and
      incorporates, *inter alia*, the attorney-client, deliberative process, and presidential
      communications privileges.  As a threshold matter, the responsive records must be
      inter-agency or intra-agency documents in order to be protected from disclosure
      under this exemption.

35.   The withheld information consists of the entirety of the Automotive Report.  This
      report contains DOC's analysis and presentation of economic, market, industry and
      statistical and other types of data and information from DOC and other
      governmental and non-governmental sources, including proprietary sources,
      relating to whether the importation of automobiles and automobile parts threatens to
      impair U.S. national security.  The Secretary also sets forth the reasoning
      underlying his findings and recommendations.

36.   DOC determined that the Automotive Report, a document prepared by DOC
      personnel at the President's request and submitted to the President, in accordance
      with the requirements of Section 232, constituted an inter-agency or intra-agency
      document.

**Presidential Communications Privilege**

37.   DOC determined that the Automotive Report is protected by the presidential

communications privilege.  This privilege protects communications or documents

that relate to presidential decision-making, which involve the President or his senior

advisors.  More specifically, the privilege extends to communications among the

President and his seniors advisors, and to documents solicited and received by the

President and his immediate White House advisors. The presidential

communications privilege is broader than the deliberative process privilege in that it

applies to documents in their entireties and includes decisional and post-decisional

records.

38.   The Secretary initiated the investigation into whether automobile and automobile

part imports threatened to impair U.S. national security in response to President

Trump's request.  Pursuant to Section 232, the  Automotive Report provides the

President with DOC's analysis of economic, market, industry and statistical and

other types of data and information from DOC and other government and non-

government sources, the findings based on that analysis and the Secretary's

recommendations for action.  By protecting communications concerning or made in

performance of the President's official responsibilities and in the process of shaping

policies and making decisions, the presidential communications privilege ensures

the President's ability to effectively discharge his constitutional powers.  The

Automotive Report, which the President solicited from the Secretary, provides the

President and his senior advisers with agency analysis and recommendations for the

President's use in connection with foreign policy and the exercise of the broad

statutory authority entrusted to him to determine the actions he deems necessary to

adjust the importation of automobiles and automobile imports to prevent the

threatened impairment of national security.

39.    Further, the Automotive Report relates to the USTR's ongoing negotiation of

agreements with foreign nations intended to adjust imports of automobile and

automobile parts so that those imports do not continue to threaten to impair national

security.  As indicated in the Proclamation, once the USTR reports back at the end

of the 180-day period, the President will determine whether he deems it necessary

to take further action under Section 232.  To publish the Automotive Report while

negotiations remain ongoing, and possibly while other actions the President may

take remain unresolved, could compromise or undermine the government's efforts.

**Deliberative Process Privilege**

40.    DOC determined that the Automotive Report contains information protected by the

deliberative process privilege.  To qualify for protection, the information must be

pre-decisional and deliberative.  If pre-decisional, deliberative communications are

routinely released to the public, DOC employees will be much more cautious in

their discussions with each other and in providing all pertinent information and

viewpoints to agency or other Executive Branch decision-makers, including the

President, in a timely manner. This lack of candor would seriously impair DOC's

ability to foster the forthright, internal discussions necessary for efficient and proper

Executive Branch decision-making in a Section 232 investigation or any other matter.

41.    The content of the Automotive Report is pre-decisional because it is provided to the President for him and his advisers to consult in deciding what actions if any are required.  The report presents the fruits of DOC's investigation, as evaluated by DOC experts, with policy options provided for the President's consideration in reaching a final decision.  Specifically, a Section 232 report contains the Secretary's findings, "the recommendations for action or inaction…[and] [i]f the Secretary finds that [the targeted products are] being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President. "  19 U.S.C. § 1862(b)(3)(A).  Where, as is the case here, the Secretary finds a threat exists and recommends action, and the President concurs, it is the President who "determine[s] the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the [targeted products] and [their] derivatives so that such imports will not threaten  to impair the national security." *Id.*

42.    The Automotive Report is deliberative because it contains DOC's analysis of whether automobile and certain automotive part imports pose a threat to impair national security, the findings premised upon this analysis and recommended actions for the President to consider.  Release of the report would harm the President's Section 232 decision-making process by revealing information pertinent to the USTR's ongoing negotiation of agreements intended to adjust the importation

of the targeted products and such further action as the President may deem
necessary.   Release of this information could also chill others from engaging in free
and fulsome analysis of positions to be taken by DOC.   Agency personnel may hold
back from sharing important observations, analyses and recommendations, or
factual information they thought should be considered, if they knew that such
deliberations would be made public, and this would seriously undermine the
development of adequate, thorough, thoughtful, soundly based analysis, especially
where, as here, it is intended for the use of the President and other senior executive
branch officials.

43.   DOC conducted a careful review of the Automotive Report in reaching its
determination that the document is exempt from disclosure under Exemption 5.   It
withheld the record in full because the exempt information is so inextricably
intertwined with nonexempt information such that segregation would result in a
meaningless set of words or phrases which have no or minimal information content.

## CONCLUSION

44.   The Secretary of Commerce's report to the President regarding whether the
importation of automobiles and certain automobile parts pose a threat of impairment
to United States national security pursuant to Section 232 of the Trade Expansion
Act of 1962, 19 U.S.C. § 1862, is exempt from disclosure pursuant to the
presidential communications and/or deliberative process privileges under FOIA
Exemption 5, 5 U.S.C. § 552(b)(5).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this $\underline{12}$th day of August, 2019.

_____
BRIAN D. LIEBERMAN

EXHIBIT 1



CAUSE *of* ACTION
═══ I N S T I T U T E ═══

Pursuing Freedom & Opportunity through Justice & Accountability℠

February 18, 2019

**VIA ELECTRONIC MAIL**

ATTN: FOIA Office
Bureau of Industry and Security
U.S. Department of Commerce
E-mail: EFOIARequest@bis.doc.gov

   **Re:**  **Freedom of Information Act Request**

Dear FOIA Officer:

   I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

   Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, CoA Institute hereby requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.[2]

   **Request for a Public Interest Fee Waiver**

   CoA Institute requests a waiver of any and all applicable fees.  FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3]  In this case, the requested records unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs.

   CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media.  Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Bureau of Industry and Security. *Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts Survey*, *available at*: https://www.bis.doc.gov/index.php/autos232 (last visited Feb. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security*, *available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Feb. 15, 2019).

[3] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 2

litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[4]  In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

### **Request To Be Classified as a Representative of the News Media**

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[5]  As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[6]  CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience.  Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works.  It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[7]  These distinct works

---

[4] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[5] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[6] *See Cause of Action*, 799 F.3d at 1121.

[7] *See, e.g.*, COA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; COA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; COA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; COA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S. Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight &*

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook.  CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[8]  In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[9]

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted.  It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[10]

### Record Production and Contact Information

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production.  If a certain portion of responsive records can be

---

*Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; *Hearing on IRS: TIGTA Update Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 26, 2015) (statement of Prashant K. Khetan, Chief Counsel, CoA Inst.), http://coainst.org/2nn5iFJ; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[8] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[9] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[10] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

Department of Commerce Bureau of Industry and Security
February 15, 2019
Page 4

produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

       If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at thomas.kimbrell@causeofaction.org.  Thank you for your attention to this matter.

*Kevin Schmidt*

_____

KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

EXHIBIT 2



Pursuing Freedom & Opportunity through Justice & Accountability℠

February 18, 2019

**VIA ELECTRONIC MAIL**

Departmental Freedom of Information Officer
Office of Privacy and Open Government
14th and Constitution Avenue NW
Mail Stop 52010FB
Washington, DC 20230
E-mail: eFOIA@doc.gov

     Re:     **Freedom of Information Act Request**

Dear FOIA Officer:

     I write on behalf of Cause of Action Institute ("CoA Institute"), a 501(c)(3) nonpartisan government oversight organization that uses investigative, legal, and communications tools to educate the public about how government accountability, transparency, and the rule of law protect individual liberty and economic opportunity.[1]

     Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.§ 552, CoA Institute hereby requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.[2]

     **Request for a Public Interest Fee Waiver**

     CoA Institute requests a waiver of any and all applicable fees.  FOIA and applicable regulations provide that the agency shall furnish requested records without or at reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."[3]  In this case, the requested records unquestionably shed light on the "operations or activities of the government," as they reveal the reasoning behind increasing taxes on American consumers through tariffs.

---

[1] *See* CAUSE OF ACTION INSTITUTE, *About*, www.causeofaction.org/about/.

[2] Bureau of Industry and Security. *Section 232 National Security Investigation: Imports of Automobiles and Automotive Parts Survey*, *available at*: https://www.bis.doc.gov/index.php/autos232 (last visited Feb. 15, 2019); Bureau of Industry and Security. *Section 232 Investigations: The Effect of Imports on the National Security*, *available at*: https://www.bis.doc.gov/index.php/other-areas/office-of-technology-evaluation-ote/section-232-investigations (last visited Feb. 15, 2019).

[3] 5 U.S.C. § 552(a)(4)(A)(iii); *see also Cause of Action v. Fed. Trade Comm'n*, 799 F.3d 1108, 1115-19 (D.C. Cir. 2015) (discussing proper application of public-interest fee waiver test).

Department of Commerce
February 18, 2019
Page 2

CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media.  Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation.  These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.[4]  In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request.

## **Request To Be Classified as a Representative of the News Media**

For fee status purposes, CoA Institute also qualifies as a "representative of the news media" under FOIA.[5]  As the D.C. Circuit recently held, the "representative of the news media" test is properly focused on the requestor, not the specific FOIA request at issue.[6]  CoA Institute satisfies this test because it gathers information of potential interest to a segment of the public, uses its editorial skills to turn raw materials into a distinct work, and distributes that work to an audience.  Although it is not required by the statute, CoA Institute gathers the news it regularly publishes from a variety of sources, including FOIA requests, whistleblowers/insiders, and scholarly works.  It does not merely make raw information available to the public, but rather distributes distinct work products, including articles, blog posts, investigative reports, newsletters, and congressional testimony and statements for the record.[7]  These distinct works

---

[4] *See also Cause of Action*, 799 F.3d at 1125-26 (holding that public interest advocacy organizations may partner with others to disseminate their work).

[5] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[6] *See Cause of Action*, 799 F.3d at 1121.

[7] *See, e.g.*, CoA INSTITUTE, EVADING OVERSIGHT: THE ORIGINS AND IMPLICATIONS OF THE IRM CLAIM THAT ITS RULES DO NOT HAVE AN ECONOMIC IMPACT (Jan. 2018), http://coainst.org/2mgpYAu; CoA Institute, *Documents Reveal Special Interest Groups Lobbied HUD for Mortgage Settlement Funds* (Aug. 8, 2017), http://coainst.org/2yLaTyF; CoA Institute, *The GSA Has No Records on its New Policy for Congressional Oversight Requests* (July 26, 2017), http://coainst.org/2eHooVq; CoA INSTITUTE, SENSITIVE CASE REPORTS: A HIDDEN CAUSE OF THE IRS TARGETING SCANDAL (Mar. 2017), http://coainst.org/2y0fbOH; CoA Institute, *Sec. Vilsack followed ethics guidelines when negotiating his future employment*, (Feb. 3, 2017), http://coainst.org/2mJljJe; CoA INSTITUTE, INVESTIGATIVE REPORT: PRESIDENTIAL ACCESS TO TAXPAYER INFORMATION (Oct. 2016), http://coainst.org/2d7qTRY; James Valvo, *There is No Tenth Exemption* (Aug. 17, 2016), http://coainst.org/2doJhBt; CoA INSTITUTE, MEMORANDUM: LEGAL ANALYSIS OF FORMER SECRETARY OF STATE HILLARY CLINTON'S USE OF A PRIVATE SERVER TO STORE EMAIL RECORDS (Aug. 24, 2015), http://coainst.org/2eXhXe1; CoA Institute, *CIA too busy for transparency* (Aug. 11, 2016), http://coainst.org/2mtzhhP; *Hearing on Revisiting IRS Targeting: Progress of Agency Reforms and Congressional Options Before the Subcomm. on Oversight, Agency Action, Fed. Rights & Fed. Courts of the S. Comm. on the Judiciary*, 114th Cong. (Aug. 5, 2015) (statement of Erica L. Marshall, Counsel, CoA Inst.), http://coainst.org/2mJC8DH; *Hearing on Watchdogs Needed: Top Government Investigator Positions Left Unfilled for Years Before the S. Comm. on Homeland Sec. & Gov't Affairs*, 114th Cong. (June 3, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2mrwHr1; *Hearing on Ongoing Oversight: Monitoring the Activities of the Justice Department's Civil, Tax and Environmental and Natural*

Department of Commerce
February 18, 2019
Page 3

are distributed to the public through various media, including the Institute's website, Twitter, and Facebook.  CoA Institute also provides news updates to subscribers via e-mail.

The statutory definition of a "representative of the news media" contemplates that organizations such as CoA Institute, which electronically disseminate information and publications via "alternative media[,] shall be considered to be news-media entities."[8]  In light of the foregoing, numerous federal agencies have appropriately recognized the Institute's news media status in connection with its FOIA requests.[9]

### Record Preservation Requirement

CoA Institute requests that the disclosure officer responsible for the processing of this request issue an immediate hold on all records responsive, or potentially responsive, to this request, so as to prevent their disposal until such time as a final determination has been issued on the request and any administrative remedies for appeal have been exhausted.  It is unlawful for an agency to destroy or dispose of any record subject to a FOIA request.[10]

---

*Resources Divisions and the U.S. Trustee Program Before the H. Comm. on the Judiciary*, 114th Cong. (May 19, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2n7LxWG; COA INSTITUTE, 2015 GRADING THE GOVERNMENT REPORT CARD (Mar. 16, 2015), http://coainst.org/2as088a; *Hearing on Potential Reforms to the Freedom of Information Act (FOIA) Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 27, 2015) (statement of Daniel Z. Epstein, Exec. Dir., CoA Inst.), http://coainst.org/2lLsph8; *Hearing on IRS: TIGTA Update Before the H. Comm. on Oversight & Gov't Reform*, 114th Cong. (Feb. 26, 2015) (statement of Prashant K. Khetan, Chief Counsel, CoA Inst.), http://coainst.org/2nn5iFJ; COA INSTITUTE, GRADING THE GOVERNMENT: HOW THE WHITE HOUSE TARGETS DOCUMENT REQUESTERS (Mar. 18, 2014), http://coainst.org/2aFWxUZ.

[8] 5 U.S.C. § 552(a)(4)(A)(ii)(II).

[9] *See, e.g.*, FOIA Request F-133-18, U.S. Agency for Int'l Dev. (Apr. 11, 2018); FOIA Request 18-HQ-F-487, Nat'l Aeronautics & Space Admin. (Apr. 11, 2018); FOIA Request 1403076-000, Fed. Bureau of Investigation (Apr. 11, 2018); FOIA Request 201800050F, Exp.-Imp. Bank (Apr. 11, 2018); FOIA Request 2016-11-008, Dep't of the Treasury (Nov. 7, 2016); FOIA Requests OS-2017-00057 & OS-2017-00060, Dep't of Interior (Oct. 31, 2016); FOIA Request 2017-00497, Office of Personnel Mgmt. (Oct. 21, 2016); FOIA Request 092320167031, Ctrs. for Medicare & Medicaid Servs. (Oct. 17, 2016); FOIA Request 17-00054-F, Dep't of Educ. (Oct. 6, 2016); FOIA Request DOC-OS-2016-001753, Dept. of Commerce (Sept. 27, 2016); FOIA Request 2016-366-F, Consumer Fin. Prot. Bureau (Aug. 11, 2016); FOIA Request F-2016-09406, Dept. of State (Aug. 11, 2016); FOIA Request 2016-00896, Bureau of Land Mgmt. (Aug. 10, 2016); FOIA Request 796939, Dep't of Labor (Mar. 7, 2016); FOIA Request 2015-HQFO-00691, Dep't of Homeland Sec. (Sept. 22, 2015); FOIA Request HQ-2015-01689-F, Dep't of Energy (Aug. 7, 2015); FOIA Request 2015-OSEC-04996-F, Dep't of Agric. (Aug. 6, 2015); FOIA Request 15-05002, Sec. & Exch. Comm'n (July 23, 2015); FOIA Request 145-FOI-13785, Dep't of Justice (Jun. 16, 2015); FOIA Request 2015-26, Fed. Energy Regulatory Comm'n (Feb. 13, 2015).

[10] *See* 36 C.F.R. § 1230.3(b) ("Unlawful or accidental destruction (also called unauthorized destruction) means . . . disposal of a record subject to a FOIA request, litigation hold, or any other hold requirement to retain the records."); *Chambers v. Dep't of the Interior*, 568 F.3d 998, 1004-05 (D.C. Cir. 2009) ("[A]n agency is not shielded from liability if it intentionally transfers or destroys a document after it has been requested under the FOIA or the Privacy Act."); *Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 41-44 (D.D.C. 1998).

Department of Commerce
February 18, 2019
Page 4

### **Record Production and Contact Information**

In an effort to facilitate document review, please provide the responsive documents in electronic form in lieu of a paper production.  If a certain portion of responsive records can be produced more readily, CoA Institute requests that those records be produced first and the remaining records be produced on a rolling basis as circumstances permit.

If you have any questions about this request, please contact me by telephone at (202) 499-2422 or by e-mail at kevin.schmidt@causeofaction.org.  Thank you for your attention to this matter.

*Kevin Schmidt*
_____
KEVIN SCHMIDT
DIRECTOR OF INVESTIGATIONS

EXHIBIT 3

8/8/2019

# DOC-IOS-2019-000827 Request Details

**Case Phase:** Closed   **Case Status:** Closed   **Due Date:** 03/19/2019

## Requester Information

## Correspondence to Requester

| Subject | From | To | Date ⬆ | Remove | Detail |
|---|---|---|---|---|---|
| FOIA DOC-IOS-2019-000827 & DOC-BIS-2019-000742 | Bobbie Parsons | Kevin Schmidt | 06/14/2019 | 🗑 | ✚ |
| FOIA DOC-IOS-2019-000827 & DOC-BIS-2019-000742 | Bobbie Parsons | Kevin Schmidt | 06/14/2019 | 🗑 | ✚ |
| Final Disposition, Request DOC-IOS-2019-000827 | Bobbie Parsons | Kevin Schmidt | 06/14/2019 | 🗑 | ✚ |
| FOIA Fee Waiver Disposition Reached for DOC-BIS-2019-000742 | System | Kevin Schmidt | 02/25/2019 | 🗑 | ✚ |
| FOIA Request DOC-BIS-2019-000742 Submitted | System | Kevin Schmidt | 02/19/2019 | 🗑 | ━ |

This message is to confirm your request submission to the FOIAonline application: View Request . Request information is as follows: Tracking Number: DOC-BIS-2019-000742 Requester Name: Kevin Schmidt Date Submitted: 02/18/2019 Request Status: Submitted Description: requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts.

## Other Correspondence

| Attached File Name ⬆ | Size (MB) | File Type | Remove |
|---|---|---|---|
| WHL SEARCH Tasker DOC-IOS-2019-000827.pdf | 0.1311 | Adobe PDF Document | 🗑 |

EXHIBIT 4

# DOC-IOS-2019-000827 Request Details

**Case Phase:** Closed    **Case Status:** Closed    **Due Date:** 03/19/2019

## Requester Information

## Correspondence to Requester

| Subject | From | To | Date ⇅ | Remove | Detail |
|---|---|---|---|---|---|
| FOIA DOC-IOS-2019-000827 & DOC-BIS-2019-000742 | Bobbie Parsons | Kevin Schmidt | 06/14/2019 | 🗑 | ➕ |
| FOIA DOC-IOS-2019-000827 & DOC-BIS-2019-000742 | Bobbie Parsons | Kevin Schmidt | 06/14/2019 | 🗑 | ➕ |
| Final Disposition, Request DOC-IOS-2019-000827 | Bobbie Parsons | Kevin Schmidt | 06/14/2019 | 🗑 | ➕ |
| FOIA Fee Waiver Disposition Reached for DOC-BIS-2019-000742 | System | Kevin Schmidt | 02/25/2019 | 🗑 | ➖ |

Your request for Fee Waiver for the FOIA request DOC-BIS-2019-000742 has been fully granted. Additional details for this request are as follows: Request Created on: 02/19/2019 Request Description: requests a copy of the Commerce Secretary's final report to the President regarding Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts. Fee Waiver Original Justification: CoA Institute has both the intent and ability to make the results of this request available to a reasonably broad public audience through various media. Its staff has significant experience and expertise in government oversight, investigative reporting, and federal public interest litigation. These professionals will analyze the information responsive to this request, use their editorial skills to turn raw materials into a distinct work, and share the resulting analysis with the public, whether through the Institute's regularly published online newsletter, memoranda, reports, or press releases.4 In addition, as CoA Institute is a non-profit organization as defined under Section 501(c)(3) of the Internal Revenue Code, it has no commercial interest in making this request. Fee Waiver Disposition Reason: N/A

| FOIA Request DOC-BIS-2019-000742 Submitted | System | Kevin Schmidt | 02/19/2019 | 🗑 | ➕ |
|---|---|---|---|---|---|

## Other Correspondence

| Attached File Name ⇅ | Size (MB) | File Type | Remove |
|---|---|---|---|
| WHL SEARCH TASKER DOC-IOS-2019-000827.pdf | 0.1311 | Adobe PDF Document | 🗑 |

EXHIBIT 5

**UNITED STATES DEPARTMENT OF COMMERCE**
**Chief Financial Officer and**
 **Assistant Secretary for Administration**
Washington, D.C. 20230

June 13, 2019

Kevin Schmidt
Director of Investigations
Cause of Action Institute
1875 Eye Street, NW
Suite 800
Washington, DC 20006

Re:     Freedom of Information Request DOC-IOS-2019-000827
        Freedom of Information Request DOC-BIS-2019-000742

Dear Mr. Schmidt:

This letter is in further response to your above-referenced Freedom of Information
(FOIA) requests to the Department of Commerce (DOC) and the Bureau of Industry &
Security (BIS), respectively, both of which were received February 18, 2019. In both of
these FOIA requests, you requested:
A copy of the Commerce Secretary's final report to the President regarding Section 232
National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans
and Light Trucks, and Automotive Parts.

Please see the attached presidential proclamation dated May 17, 2019, which provides a
summary of the findings in the Secretary's report.

We are currently reviewing, in conjunction with the Executive Office of the President,
whether the Secretary's report constitutes a presidential record within the meaning of the
Presidential Records Act, 44 U.S.C. 2201 et seq., in which case it would not be subject to
disclosure under FOIA. However, to the extent that the Secretary's Section 232 report to
the President of the United States may constitute an agency record within the meaning of
FOIA, DOC and BIS are withholding it in full pursuant to 5 U.S.C. § 552(b)(5), which
exempts from disclosure inter-agency or intra-agency memorandums or letters which
would not be available by law to a party other than an agency in litigation with the
agency. The report, if an agency record, would be exempted from disclosure under FOIA
pursuant to the presidential communications privilege and/or the deliberative process
privilege, until all actions deemed necessary to adjust the imports of automobiles and
automobile parts so that such imports will not threaten to impair the national security
have been completed. See 15 C.F.R. § 705.11.

Although we are aware that this matter is already in litigation, we are required to notify
you that if you are dissatisfied with this determination, you have the right to file an
administrative appeal if you are not satisfied with our response to your FOIA request. All
appeals should include a statement of the reasons why you believe the FOIA response
was not satisfactory. An appeal based on documents in this release must be received
within 90 calendar days of the date of this response letter at the following address:

Kevin Schmidt
DOC-IOS-2019-000827 and
  DOC-BIS-2019-000742
Page 2

> Assistant General Counsel for Employment, Litigation, and Information
> U.S. Department of Commerce
> Office of General Counsel, Room 5896
> 1401 Constitution Ave. NW,
> Washington, DC 20230

An appeal may also be sent by e-mail to FOIAAppeals@doc.gov, or by FOIAonline at
https://foiaonline.regulations.gov/foia/action/public/home#.

For your appeal to be complete, it must include the following items:
- a copy of the original request,
- our response to your request,
- a statement explaining why the withheld records should be made available, and
why the denial of the records was in error, and
- "Freedom of Information Act Appeal" must appear on your appeal letter. It should
also be written on your envelope, or e-mail subject line.

FOIA appeals posted to the e-mail box, FOIAonline, or Office after normal business
hours will be deemed received on the next business day. If the 90th calendar day for
submitting an appeal falls on a Saturday, Sunday or legal public holiday, an appeal
received by 5:00 p.m., Eastern Time, the next business day will be deemed timely.

Again, although we are aware this matter is in litigation, we are required to inform you
that FOIA grants requesters the right to challenge an agency's final action in federal
court. Before doing so, an adjudication of an administrative appeal is ordinarily required.

The Office of Government Information Services (OGIS), an office created within the
National Archives and Records Administration, offers free mediation services to FOIA
requesters. Its contact information is:

> Office of Government Information Services
> National Archives and Records Administration
> 8601 Adelphi Road, Room 2510
> College Park, MD 20740-6001
> Email: ogis@nara.gov
> Phone: 301-837-1996
> Fax: 301-837-0348
> Toll-free: 1-877-684-6448

Because these requests are in litigation in Cause of Action v. DOC (D.D.C. No. 19-cv-
778), if you have questions regarding this correspondence, please contact Ms. Melanie

Kevin Schmidt
DOC-IOS-2019-000827 and
    DOC-BIS-2019-000742
Page 3

Hendry, Assistant U.S. Attorney and counsel of record for DOC in this matter, at
melanie.hendry2@usdoj.gov, or by phone at (202) 252-2510.

Sincerely,

ROBERTA   Digitally signed by
          ROBERTA PARSONS
PARSONS   Date: 2019.06.14
          14:35:30 -04'00'

Bobbie Parsons
FOIA Officer, Immediate Office of the Secretary
Office of Privacy and Open Government
U.S. Department of Commerce

Enclosure:
        One (1) document Six (6) pages

EXHIBIT 6

Statement from the President on Potential National Security Investigation into Automobile Imports | The White House    Page 1 of 1

Case 1:19-cv-00779-CJN    Document 20-3    Filed 08/19/19    Page 38 of 49



STATEMENTS & RELEASES

# Statement from the President on Potential National Security Investigation into Automobile Imports

**NATIONAL SECURITY & DEFENSE**

Issued on: **May 23, 2018**

★ ★ ★

Today, I met with Secretary of Commerce Wilbur Ross to discuss the current state of our automobile industry. I instructed Secretary Ross to consider initiating a Section 232 investigation into imports of automobiles, including trucks, and automotive parts to determine their effects on America's national security. Core industries such as automobiles and automotive parts are critical to our strength as a Nation.

EXHIBIT 7

3. Reporting

After grant approval and through grant completion, you will be required to provide the following:

a. An SF–425, "Federal Financial Report," and a project performance report will be required on a semiannual basis (due 30 working days after end of the semiannual period). The project performance reports shall include the following: A comparison of actual accomplishments to the objectives established for that period;

b. Reasons why established objectives were not met, if applicable;

c. Reasons for any problems, delays, or adverse conditions, if any, which have affected or will affect attainment of overall project objectives, prevent meeting time schedules or objectives, or preclude the attainment of particular objectives during established time periods. This disclosure shall be accompanied by a statement of the action taken or planned to resolve the situation; and

d. Objectives and timetable established for the next reporting period.

e. Provide a final project and financial status report within 60 days after the expiration or termination of the grant.

f. Provide outcome project performance reports and final deliverables.

*G. Agency Contacts*

If you have questions about this Notice, please contact the appropriate State Office at *http://www.rd.usda.gov/ contact-us/state-offices.* Program guidance as well as application and matching funds templates may be obtained at *http://www.rd.usda.gov/ programs-services/rural-cooperative-development-grant-program.* If you want to submit an electronic application, follow the instructions for the RCDG funding announcement located at *http:// www.grants.gov.* You may also contact National Office staff: Natalie Melton, RCDG Program Lead, *natalie.melton@ wdc.usda.gov,* or call the main line at 202–690–1374.

*H. Nondiscrimination Statement*

In accordance with Federal civil rights law and U.S. Department of Agriculture (USDA) civil rights regulations and policies, the USDA, its Agencies, offices, and employees, and institutions participating in or administering USDA programs are prohibited from discriminating based on race, color, national origin, religion, sex, gender identity (including gender expression), sexual orientation, disability, age, marital status, family/

parental status, income derived from a public assistance program, political beliefs, or reprisal or retaliation for prior civil rights activity, in any program or activity conducted or funded by USDA (not all bases apply to all programs). Remedies and complaint filing deadlines vary by program or incident.

Persons with disabilities who require alternative means of communication for program information (*e.g.,* Braille, large print, audiotape, American Sign Language, etc.) should contact the responsible Agency or USDA's TARGET Center at (202) 720–2600 (voice and TTY) or contact USDA through the Federal Relay Service at (800) 877–8339. Additionally, program information may be made available in languages other than English.

To file a program discrimination complaint, complete the USDA Program Discrimination Complaint Form, AD–3027, found online at *http:// www.ascr.usda.gov/complaint_filing_ cust.html* and at any USDA office or write a letter addressed to USDA and provide in the letter all of the information requested in the form. To request a copy of the complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by:

(1) *Mail:* U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410;

(2) *Fax:* (202) 690–7442; or

(3) *Email: program.intake@usda.gov.*

Dated: May 22, 2018.

**Bette B. Brand,**

*Administrator, Rural Business-Cooperative Service.*

[FR Doc. 2018–11482 Filed 5–29–18; 8:45 am]

**BILLING CODE 3410–XY–P**

---

# DEPARTMENT OF COMMERCE

## Notice of Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts

**AGENCY:** U.S. Department of Commerce.

**ACTION:** Notice of request for public comments and public hearing.

---

**SUMMARY:** On May 23, 2018, the Secretary of Commerce initiated an investigation to determine the effects on the national security of imports of automobiles, including cars, SUVs, vans and light trucks, and automotive parts. This investigation has been initiated under section 232 of the Trade

Expansion Act of 1962, as amended. Interested parties are invited to submit written comments, data, analyses, or other information pertinent to the investigation to the Department of Commerce by June 22, 2018. Rebuttal comments will be due by July 6, 2018. The Department of Commerce will also hold a public hearing on the investigation on July 19 and 20, 2018 in Washington, DC. This notice identifies the issues on which the Department is interested in obtaining the public's views. It also sets forth the procedures for public participation in the hearing.

**DATES:** The due date for filing comments, for requests to appear at the public hearing, and for submissions of a summary of expected testimony at the public hearing is June 22, 2018.

The due date is July 6, 2018 for rebuttal comments submitted in response to any comments filed on or before June 22, 2018.

The public hearings will be held on July 19 and 20, 2018. The hearings will begin at 8:30 a.m. local time and conclude at 5:00 p.m. local time, each day.

**ADDRESSES:** *Written comments:* All written submissions must be in English and must be addressed to Section 232 Automobile and Automotive Parts Imports Investigation, and filed through the Federal eRulemaking Portal: *http:// www.regulations.gov.* To submit comments via *www.regulations.gov,* enter docket number DOC–2018–0002 on the home page and click "search." The site will provide a search results page listing all documents associated with this docket. Find a reference to this notice and click on the link entitled "Comment Now!" (For further information on using *www.regulations.gov,* please consult the resources provided on the website by clicking on "How to Use This Site" on the left side of the home page). For alternatives to on-line submissions, please contact Sahra Park-Su at (202) 482–2811.

*Hearings:* The public hearings will be held in the Department of Commerce's auditorium at 1401 Constitution Avenue NW, Washington, DC 20230.

**FOR FURTHER INFORMATION CONTACT:** Sahra Park-Su, U.S. Department of Commerce (202) 482–2811. For more information about the section 232 program, including the regulations and the text of previous investigations, see *www.bis.doc.gov/232.*

**SUPPLEMENTARY INFORMATION:**

**Background**

On May 23, 2018, the Secretary of Commerce ("Secretary") initiated an

investigation under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), to determine the effects on the national security of imports of automobiles, including cars, SUVs, vans and light trucks, and automotive parts. If the Secretary finds that automobiles and/or automotive parts are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall recommend actions and steps that should be taken to adjust automobile and/or automotive parts imports so that they will not threaten to impair the national security.

**Written Comments**

This investigation is being undertaken in accordance with part 705 of the National Security Industrial Base Regulations (15 CFR parts 700 to 709) ("NSIBR"). Interested parties are invited to submit written comments, data, analyses, or information pertinent to this investigation to the U.S. Department of Commerce by June 22, 2018. Rebuttal comments submitted in response to comments received on or before June 22, 2018 may be filed no later than July 6, 2018.

The Department is particularly interested in comments and information directed to the criteria listed in § 705.4 of the NSIBR as they affect national security, including the following:

• The quantity and nature of imports of automobiles, including cars, SUVs, vans and light trucks, and automotive parts and other circumstances related to the importation of automobiles and automotive parts;

• Domestic production needed for projected national defense requirements;

• Domestic production and productive capacity needed for automobiles and automotive parts to meet projected national defense requirements;

• The existing and anticipated availability of human resources, products, raw materials, production equipment, and facilities to produce automobiles and automotive parts;

• The growth requirements of the automobiles and automotive parts industry to meet national defense requirements and/or requirements to assure such growth, particularly with respect to investment and research and development;

• The impact of foreign competition on the economic welfare of the U.S. automobiles and automotive parts industry;

• The displacement of any domestic automobiles and automotive parts

causing substantial unemployment, decrease in the revenues of government, loss of investment or specialized skills and productive capacity, or other serious effects;

• Relevant factors that are causing or will cause a weakening of our national economy;

• The extent to which innovation in new automotive technologies is necessary to meet projected national defense requirements;

• Whether and, if so, how the analysis of the above factors changes when U.S. production by majority U.S.-owned firms is considered separately from U.S. production by majority foreign-owned firms; and

• Any other relevant factors.

**Additional Requirements for Written Comments**

The *www.regulations.gov* website allows users to provide comments by filling in a "Type Comment" field, or by attaching a document using an "Upload File" field. The Department prefers that comments be provided in an attached document. The Department prefers submissions in Microsoft Word (.doc) or Adobe Acrobat (.pdf). If the submission is in an application other than those two, please indicate the name of the application in the "Type Comment" field. Please do not attach separate cover letters to electronic submissions; rather, include any information that might appear in a cover letter in the comments themselves. Similarly, to the extent possible please include any exhibits, annexes, or other attachments in the same file as part of the submission itself rather than in separate files.

Comments will be placed in the docket and open to public inspection, except confidential business information. Comments may be viewed on *www.regulations.gov* by entering docket number DOC–2018–0002 in the search field on the home page.

Material that is business confidential information will be exempted from public disclosure as provided for by § 705.6 of the regulations. Anyone submitting business confidential information should clearly identify the business confidential portion of the submission, then file a statement justifying nondisclosure and referring to the specific legal authority claimed, and provide a non-confidential version of the submission which can be placed in the public file on *http://www.regulations.gov*.

For comments submitted electronically containing business confidential information, the file name of the business confidential version should begin with the characters "BC".

Any page containing business confidential information must be clearly marked "BUSINESS CONFIDENTIAL" on the top of that page. The file name of the non-confidential version should begin with the character "P". The "BC" and "P" should be followed by the name of the person or entity submitting the comments or rebuttal comments. Filers submitting comments containing no business confidential information should name their file using the name of the person or entity submitting the comments.

Communications from agencies of the United States Government will not be made available for public inspection. Please note that the submission of a summary of expected testimony at the public hearing is separate from the submission of other written comments and should be submitted separately.

**Public Hearing**

Consistent with the interest of the U.S. Department of Commerce in soliciting public comments on issues affecting U.S. industry and national security, the Department is holding a public hearing as part of the investigation. The hearing will further assist the Department in determining whether imports of automobiles and automotive parts threaten to impair the national security and in recommending remedies if such a threat is found to exist. Public comments at the hearing should address the criteria listed in § 705.4 of the NSIBR as they affect national security described above.

The hearing will be held on July 19 and 20, 2018 at the U.S. Department of Commerce auditorium, 1401 Constitution Avenue NW, Washington, DC 20230. The hearing will begin at 8:30 a.m. local time and conclude at 5:00 p.m. local time, each day.

**Procedure for Requesting Participation**

The Department encourages interested public participants to present their views orally at the hearing. Any person wishing to make an oral presentation at the hearing must submit a written request to the Department of Commerce by June 22, 2018. The request to appear must include a summary of the expected testimony, and may also be accompanied by additional material. Remarks at the hearing may be limited to five minutes to allow for possible questions from U.S. government representatives.

All submissions must be in English and sent electronically via *www.regulations.gov*. To submit a request to appear at the hearing via *www.regulations.gov*, enter docket number DOC–2018–0002. In the "Type

Comment'' field, include name, address, email address, and telephone number of the person presenting the testimony, as well as the organization or company that they represent. Attach a summary of the testimony, and pre-hearing submission if provided, by using the ''Upload File'' field. The file name should include the name of the person who will be presenting the testimony.

The request to speak should include (1) the name and address of the person requesting to make a presentation; (2) a daytime phone number where the person who would be making the oral presentation may be contacted before the hearing; (3) the organization or company they represent; and (4) an email address.

Please note that the submission of a summary of expected testimony at the public hearing is separate from the request for written comments. Since it may be necessary to limit the number of persons making presentations, the written request to participate in the public hearing should describe the individual's interest in the hearing and, where appropriate, explain why the individual is a proper representative of a group or class of persons that has such an interest. If all interested parties cannot be accommodated at the hearing, the summaries of the oral presentations will be used to allocate speaking time and to ensure that a full range of comments is heard.

Each person selected to make a presentation will be notified by the Department of Commerce no later than 8:00 p.m. Eastern Daylight Time on July 12, 2018. The Department will arrange the presentation times for the speakers. Persons selected to be heard are requested to bring 20 copies of their oral presentation and of all exhibits to the hearing site on the day of the hearing. All such material must be of a size consistent with ease of handling, transportation and filing. While large exhibits may be used during a hearing, copies of such exhibits in reduced size must be provided to the hearing panel. Written submissions by persons not selected to make presentations will be made part of the public record of the proceeding. Confidential business information may not be submitted at a public hearing. In the event confidential business information is submitted it will be handled according to the same procedures applicable to such information provided in the course of an investigation. See 15 CFR 705.6. The hearing will be recorded.

The transcript of the hearing will be available on *www.regulations.gov* in docket number DOC–2018–0002.

## Conduct of the Hearing

The Department reserves the right to select the persons to be heard at the hearing, to schedule their respective presentations, and to establish the procedures governing the conduct of the hearing. Each speaker may be limited to 5 minutes, and comments must be directly related to the criteria listed in 15 CFR 705.4 of the regulations. Attendees will be seated on a first-come, first-served basis.

A Department official will be designated to preside at the hearing. The presiding officer shall determine all procedural matters during the hearing. Representatives from the Department, and other U.S. Government agencies as appropriate, will make up the hearing panel. This will be a fact-finding proceeding; it will not be a judicial or evidentiary-type hearing. Only members of the hearing panel may ask questions, and there will be no cross-examination of persons presenting statements. However, questions submitted to the presiding officer in writing may, at the discretion of the presiding officer, be posed to the presenter. No formal rules of evidence will apply to the hearing.

Any further procedural rules for the proper conduct of the hearing will be announced by the presiding officer.

## Special Accommodations

This meeting is physically accessible to people with disabilities. Requests for sign language interpretation or other auxiliary aids should be received by the Department of Commerce no later than June 22, 2018 by contacting the Department of Commerce official identified in this Notice.

Dated: May 24, 2018.

**Wilbur L. Ross,**

*Secretary of Commerce.*

[FR Doc. 2018–11708 Filed 5–25–18; 4:15 pm]

**BILLING CODE P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

[A–533–875]

## Fine Denier Polyester Staple Fiber From India: Final Affirmative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that fine denier polyester staple fiber (fine denier PSF) from India is being, or is likely to be, sold in the United States at less than fair

value (LTFV). The period of investigation (POI) is April 1, 2016, through March 31, 2017.

**DATES:** Applicable May 30, 2018.

**FOR FURTHER INFORMATION CONTACT:** Patrick O'Connor, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0989.

**SUPPLEMENTARY INFORMATION:**

## Background

On January 5, 2018, Commerce published the *Preliminary Determination* of this antidumping duty investigation, as provided by section 735 of the Tariff Act of 1930, as amended (the Act). Commerce preliminarily found that fine denier PSF from India was sold at LTFV.[1] A summary of the events that have occurred since Commerce published the *Preliminary Determination*, as well as a full discussion of the issues raised by interested parties for this final determination, may be found in the Issues and Decision Memorandum.[2] The Issues and Decision Memorandum is a public document and is on file electronically *via* Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*, and to all parties in the Central Records Unit, room B8024 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/frn/*.

Commerce has exercised its discretion to toll deadlines for the duration of the closure of the Federal Government from January 20 through 22, 2018. The revised deadline for the final determination in this investigation is now May 23, 2018.[3]

---

[1] See *Fine Denier Polyester Staple Fiber from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures* 83 FR 662 (January 5, 2018), and accompanying Preliminary Decision Memorandum (collectively, *Preliminary Determination*).

[2] See Memorandum, ''Fine Denier Polyester Staple Fiber from India: Issues and Decision Memorandum for the Final Affirmative Determination in the Less Than Fair Value,'' dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] See Memorandum for The Record from Christian Marsh, Deputy Assistant Secretary for Enforcement and Compliance, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance, ''Deadlines Affected by the Shutdown of the

Continued

EXHIBIT 8



**PROCLAMATIONS**

# Adjusting Imports of Automobiles and Automobile Parts Into the United States

— **ECONOMY & JOBS**

Issued on: **May 17, 2019**

★ ★ ★

1. On February 17, 2019, the Secretary of Commerce (Secretary) transmitted to me a report on his investigation into the effects of imports of passenger vehicles (sedans, sport utility vehicles, crossover utility vehicles, minivans, and cargo vans) and light trucks (collectively "automobiles") and certain automobile parts (engines and engine parts, transmissions and powertrain parts, and electrical components) on the national security of the United States under section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862).

2. The report found that automotive research and development (R&D) is critical to national security. The rapid application of commercial breakthroughs in automobile technology is necessary for the United States to retain competitive military advantage and meet new defense requirements. Important innovations are occurring in the areas of engine and powertrain technology, electrification, lightweighting, advanced connectivity, and autonomous driving. The United States defense industrial base depends on the American-owned automotive sector for the development of technologies that are essential to maintaining our military superiority.

Case 1:19-cv-00778-CJN   Document 20-3   Filed 08/19/19   Page 45 of 49

3. Thus, the Secretary found that American-owned automotive R&D and manufacturing are vital to national security. Yet, increases in imports of automobiles and automobile parts, combined with other circumstances, have over the past three decades given foreign-owned producers a competitive advantage over American-owned producers.

4. American-owned producers' share of the domestic automobile market has contracted sharply, declining from 67 percent (10.5 million units produced and sold in the United States) in 1985 to 22 percent (3.7 million units produced and sold in the United States) in 2017. During the same time period, the volume of imports nearly doubled, from 4.6 million units to 8.3 million units. In 2017, the United States imported over 191 billion dollars' worth of automobiles.

5. Furthermore, one circumstance exacerbating the effects of such imports is that protected foreign markets, like those in the European Union and Japan, impose significant barriers to automotive imports from the United States, severely disadvantaging American-owned producers and preventing them from developing alternative sources of revenue for R&D in the face of declining domestic sales. American-owned producers' share of the global automobile market fell from 36 percent in 1995 to just 12 percent in 2017, reducing American-owned producers' ability to fund necessary R&D.

6. Because "[d]efense purchases alone are not sufficient to support . . . R&D in key automotive technologies," the Secretary found that "American-owned automobile and automobile parts manufacturers must have a robust presence in the U.S. commercial market" and that American innovation capacity "is now at serious risk as imports continue to displace American-owned production." Sales revenue enables R&D expenditures that are necessary for long-term automotive technological superiority, and automotive technological superiority is essential for the national defense. The lag in R&D expenditures by American-owned producers is weakening innovation and, accordingly, threatening to impair our national security.

7. In light of all of these factors, domestic conditions of competition must be improved by reducing imports. American-owned producers must be able to increase R&D expenditures to ensure technological leadership that can meet national defense requirements.

8. The Secretary found and advised me of his opinion that automobiles and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. The Secretary found that these imports are "weakening our internal economy" and that "[t]he contraction of the American-owned automotive industry, if continued, will significantly impede the United States' ability to develop technologically advanced products that are essential to our ability to maintain technological superiority to meet defense requirements and cost effective global power projection."

9. The Secretary therefore concluded that the present quantities and circumstances of automobile and certain automobile parts imports threaten to impair the national security as defined in section 232 of the Trade Expansion Act of 1962, as amended.

10. In reaching this conclusion, the Secretary considered the extent to which import penetration has displaced American-owned production, the close relationship between economic welfare and national security, see 19 U.S.C. 1862(d), the expected effect of the recently negotiated United States-Mexico-Canada Agreement (USMCA), and what would happen should the United States experience another economic downturn comparable to the 2009 recession.

11. In light of the report's findings, the Secretary recommended actions to adjust automotive imports so that they will not threaten to impair the national security. One recommendation was to pursue negotiations to obtain agreements that address the threatened impairment of national security. In the Secretary's judgment, successful negotiations could allow American-owned automobile

producers to achieve long-term economic viability and increase R&D spending to develop cutting-edge technologies that are critical to the defense industry.

12. I concur in the Secretary's finding that automobiles and certain automobile parts are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, and I have considered his recommendations.

13. I have also considered the renegotiated United States-Korea Agreement and the recently signed USMCA, which, when implemented, could help to address the threatened impairment of national security found by the Secretary.

14. Section 232 of the Trade Expansion Act of 1962, as amended, authorizes the President to take action to adjust the imports of an article and its derivatives that are being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security. If that action is the negotiation of an agreement contemplated in 19 U.S.C. 1862(c)(3)(A)(i), and such an agreement is not entered into within 180 days of the proclamation or is not being carried out or is ineffective, then the statute authorizes the President to take other actions he deems necessary to adjust imports and eliminate the threat that the imported article poses to national security. *See* 19 U.S.C. 1862(c)(3)(A).

15. I have decided to direct the United States Trade Representative (Trade Representative) to pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate, and to update me on the progress of such negotiations within 180 days. Under current circumstances, this action is necessary and appropriate to remove the threatened impairment of the national security.

Now, Therefore, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including section 301 of title 3, United States Code, and section 232 of the Trade Expansion Act of 1962, as amended, do hereby proclaim as follows:

(1)  The Trade Representative, in consultation with the Secretary, the Secretary of the Treasury, and any other senior executive branch officials the Trade Representative deems appropriate, shall pursue negotiation of agreements contemplated in 19 U.S.C. 1862(c)(3)(A)(i) to address the threatened impairment of the national security with respect to imported automobiles and certain automobile parts from the European Union, Japan, and any other country the Trade Representative deems appropriate.

(2)  Within 180 days of the date of this proclamation, the Trade Representative shall update me on the outcome of the negotiations directed under clause (1) of this proclamation.

(3)  The Secretary shall continue to monitor imports of automobiles and certain automobile parts and shall, from time to time, in consultation with any senior executive branch officials the Secretary deems appropriate, review the status of such imports with respect to the national security.  The Secretary shall inform the President of any circumstances that in the Secretary's opinion might indicate the need for further action by the President under section 232 of the Trade Expansion Act of 1962, as amended.

(4)  Any provision of previous proclamations and Executive Orders that is inconsistent with the actions taken in this proclamation is superseded to the extent of such inconsistency.

IN WITNESS WHEREOF, I have hereunto set my hand this
seventeenth day of May, in the year of our Lord two thousand nineteen, and of the Independence of the United States of America the two hundred and forty-third.

DONALD J. TRUMP