**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE, | |
| Plaintiff, | |
| v. | Civ. A. No. 19-0778 (CJN) |
| UNITED STATES DEPARTMENT OF COMMERCE, | |
| Defendant. | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO**
**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

For the reasons set forth in the initial memorandum of law of Defendant United States Department of Commerce (DOC), the supporting declaration and below, DOC respectfully submits that Court should grant DOC's motion for summary judgment, deny Plaintiff's cross-motion for summary judgment of, and dismiss this action in its entirety with prejudice.

## I. INTRODUCTION

In the interest of safeguarding national security, Congress has compelled the President to take actions to insure that imports do not threaten to impair the national security. 19 U.S.C. § 1862 (entitled "Safeguarding national security") (hereinafter "Section 232").  To support the President in that critical task, Congress has compelled the Secretary of Commerce (hereinafter either "the Secretary" or "DOC") to investigate, report on, advise, and make specific recommendations for action or inaction with respect to those imports that, by virtue of quantity or the circumstance of their importation, "threaten to impair the national security."  Section 232 both solicits and ensures the President receives the tools—in the form of DOC's wise counsel—to combat whatever threat

to national security is identified.  The Section 232 investigation and report ("Automotive Report" or "Report") in this case relate to the national-security impact of the importation of passenger vehicles and automobile parts.

The Automotive Report, containing recommendations and advice, forms a type of roadmap that the President may use to exercise his discretion including whether to concur with the Secretary's findings (§1862(c)(1)(A)(i)); how to determine the nature, scope and duration of action to eliminate the threat (§1862(c)(1)(A)(ii)); how to adjust the imports of such articles (§1862(c)(1)(B)); whether to embark on negotiation of trade agreements (§1862(c)(3)(A)(i)); what other actions to take in the event earlier actions fail to eliminate the threat (§1862(c)(3)); and how to account for the myriad "requirements of national security without excluding other relevant factors," including the impact of foreign competition on the economic welfare of domestic industries (§1862(d)).

The stakes here must not be forgotten.  If Section 232 is in play, it is because another nation-state—potentially, an economic rival engaging in unfair practices—has imported article of commerce in a manner that threatens to impair the United States' national security.  Fulfilling a familiar role, the President, with the help of experienced advisors, is charged with deciding upon and implementing a plan to eliminate the identified economic threat that Congress deems a matter of national security.  Because the target of a Section 232 investigation is bound to have contrary interests, it is hardly surprising that when Section 232 is implicated the stage is set for a potential adversarial confrontation.

Against this backdrop, Plaintiff's position must be assessed.  According to Plaintiff, in an ongoing confrontation with an economic adversary threatening the United States' national security, DOC must publicly release—and expose to that adversary—the confidential advice and

recommendations given to the President for eliminating the threat posed by that adversary at the very time when disclosure could produce the greatest harm.

This illogical result is the product of two equally illogical and untenable premises:  first, despite the absence of a deadline for publishing confidential advice and recommendations at the core of executive privilege, publication may not be delayed until the dangers they target are neutralized; and, second, the submission of the DOC's deliberations, advice and recommendations to their statutorily-intended recipient—the President—destroys the confidentiality those protections were designed to provide.  For all the reasons stated below, and in DOC's prior submission, these meritless assertions, and the additional arguments that inform or flow from them, should be rejected.

**ARGUMENT**

Plaintiff Cause of Action Institute (Plaintiff) contends that DOC cannot withhold from disclosure the Automotive Report pursuant to the presidential communications privilege or deliberative process privilege, even though it was created for and received by the President at his request, and even though the government, including the President and the United States Trade Representative (USTR), is currently utilizing it in connection with ongoing treaty negotiations with foreign nations.  Nonetheless, Plaintiff invites this Court to ignore controlling D.C. Circuit precedents and compel DOC to make the Report public under FOIA to all who wish to view it (including the United States' foreign adversaries).  The Court should decline Plaintiff's invitation as its arguments plainly lack merit.

**A.**     ***The Automotive Report is an "Inter-Agency or Intra-Agency Memorandum or Letter" Pursuant to Well-Established Precedent.***

In a threshold attack on both the presidential communications and deliberative process privilege assertions, Plaintiff contends (Pl. Opp. at 8-13) that the Automotive Report is neither an

"inter-agency or intra-agency memorandum or letter" because it was prepared for by the President, and the President is not an "agency" for purposes of FOIA. But the D.C. Circuit has consistently rejected this argument:

> We think it inconceivable [that] Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is made by 'agency' officials subject to oversight by the President and not when the decision is to be made by the President himself and those same officials are acting in aid of his decision-making processes . . . That the President, rather than an agency, initiated the policy development process is of no moment; what matters is whether a document will expose the pre-decisional and deliberative processes of the Executive Branch.

*Judicial Watch Inc. v. Dep't of Justice* (*Judicial Watch I*), 412 F.3d 125, 130-31 (D.C. Cir. 2005). Specifically, the D.C. Circuit has ruled that the deliberations of a presidential advisory group were protected from disclosure because, even though it was not an "agency" subject to FOIA, the group's "sole function [was] to advise and assist the President." *Id*. at 129; *see also Ryan v. Dep't of Justice*, 617 F.2d 781, 789-90 (D.C. Cir. 1980) (documents exchanged between Justice Department and Senators, who are not agencies within the meaning of FOIA, deemed intra-agency); *Elec. Privacy Info. Ctr. v. Dep't of Justice (EPIC),* 320 F. Supp. 3d 110, 117 (D.D.C. 2018) (applying privilege to report created by the Department of Justice at the request of the White House Counsel's Office); *Judicial Watch, Inc. v. Consumer Fin. Prot. Bd.*, 60 F. Supp. 3d 1, 10 (D.D.C. 2014) (emails between White House counsel and agency employees covered by privilege).

Faced with a long list of authorities foreclosing its argument, Plaintiff invites this Court to defy Circuit precedent, force the President to seek protection under the Presidential Records Act, and cast about for an analogy from the distinguishable treatment of communications between executive agencies and Congress. None of these arguments holds water.

Plaintiff's primary argument rests not on precedent, but a rejection of it. Plaintiff attacks (Pl. Opp. at 8) this Circuit's holding in *Judicial Watch I* as representative of "expansion . . .

inconsistent with the textual limitations imposed by Congress and the plain meaning of Exemption

5." But *Judicial Watch I* explains the fallacy of this position:

> Our interpretation of Exemption 5 is not inconsistent with its textual limitation to "intra-agency" or "inter-agency" communications, as the plaintiffs suggest. Rather, it follows from the principle, well established in this circuit, that a document need not be created by an agency or remain in the possession of the agency in order to qualify as "intra-agency." Consider, for instance, *Ryan v. Department of Justice*, 617 F.2d 781 (1980):
>
> > When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5.

412 F.3d at 130 (quoting *Ryan*, 617 F.2d at 790); *see also Protect Democracy Project v. Dep't of Energy*, 330 F.Supp.3d 515, 527 (D.D.C. 2018) (observing that the holding of *Judicial Watch* "reflected the basic need of the President and his White House staff to monitor the consistency of executive agency regulations with Administration policy"); *Judicial Watch, Inc. v. Dep't of State,* 306 F. Supp. 3d 97, 106, 109 ("inter-agency"/"intra-agency" status met when records exchanged between Executive Branch agency and the President and his close advisors).  To construe Exemption 5 as Plaintiff urges would illogically detach the President from the executive agencies whose primary function is to serve him.

The above considerable contrary authority conclusively rejects Plaintiff's advocated and unsupported "plain meaning" construction of Exemption 5's inter-agency or intra-agency memorandum or letter requirement.  Moreover, the definitions of "inter-" and "intra-" Plaintiff cites, as "between" and "within," respectively, are consistent with D.C. Circuit authority extending the Exemption 5 privileges to exchanges of memoranda and letters either between Executive Branch agencies and the President or from within a unitary Executive Branch whose ultimate superior is the President. Whether the President and his closest White House advisors are an

"agency" for purposes of imposition of "FOIA disclosure requirements" is quite different from whether the President and those same advisors are part of or their own "agency" for purpose of application of privileges aptly protecting appropriately confidential communications.

Because the same or similar words can have different meanings depending upon the purpose to which they are put (*see, e.g., Envtl. Def. Fund v. Costle*, 631 F.2d 922, 927-28 (D.C. Cir. 1980)), a "plain meaning" construction is not at odds with defining "agency" one way for purposes of excluding the President from the disclosure obligations of FOIA and another way for different purpose of insuring that his status does not destroy the privilege when reviewing "agency" documents intended for this benefit.  *See, e.g., Berman v. CIA,* 378 F. Supp. 2d 1209, 1219-20 (E.D. Cal. 2005)*, aff'd on other grounds,* 501 F.3d 1136 (9th Cir. 2007) ("Congress exempted the President from the definition of an 'agency' under FOIA because it wanted to protect the President from the burdens and intrusions of FOIA, not because it sought to deny the President the protections afforded by the exemptions for information communicated to the President but retained in an agency file.").

Also, the fact that records that are not agency records (including records covered by the Presidential Records Act) are unavailable under FOIA does nothing to limit the protections afforded by Exemption 5 that are subject to FOIA.  *See generally Prop. of the People, Inc. v. Office of Mgmt. & Budget*, Civ. A. No. 17-1677 (RC), --- F. Supp. 3d ---, 2019 WL 3891166, at *5 (D.D.C. Aug. 19, 2019) ("Whether an entity constitutes an 'agency' for FOIA purposes is admittedly a different question than whether a FOIA exemption applies.").  Plaintiff's attempt to buttress its argument by drawing an analogy to post-decisionmaking communications between the Executive and Legislative Branches that are not protected by Exemption 5 misses the mark.  Pl. Opp. at 12.  Here, the Automotive Report is clearly predecisional to the Executive's decisions and

the communications are not being provided to another branch for legislative purposes.  As such,

Plaintiff's comparison of the predecisional Automotive Report to the post-decisional letter at issue

in *Dow Jones & Co. v. Department of Justice*, 917 F.2d 571, 574 (D.C. Cir. 1990), neither supports

Plaintiff's arguments nor provides a basis for ignoring clear D.C. Circuit precedent that

communications with the White House fall within the scope of Exemption 5.

For all these reasons, the Automotive Report constitutes an inter-agency or intra-agency

letter or memorandum within the meaning of FOIA Exemption 5.

**B.     DOC Properly Invoked the Presidential Communication Privilege to Withhold the Automotive Report.**

**i.     The Privilege Applies to the President's Exercise of Statutory Powers Under Section 232.**

Plaintiff argues that DOC cannot invoke the presidential communication privilege to

withhold the Report, but upon close inspection, it is not clear why.

Plaintiff begins by misunderstanding the scope of the presidential communication

privilege.  That is, Plaintiff suggests that the type of power the President is exercising controls the

scope of the presidential communications privilege, describing it alternatively as "one important

factor," a subject of "special significance," or "relevant" to its invocation.  Pl. Opp. at 14-17.  But

controlling authorities reject this view, finding that the nature of the power at play does not limit

the scope of the privilege.  *See, e.g., Judicial Watch, Inc. v. Dep't of Justice (Judicial Watch II)*,

365 F.3d 1108, 1123 (D.C. Cir. 2004) (limiting protection of presidential communications

privilege to only "'quintessential and nondelegable Presidential power' . . . draws an arbitrary

line"); *Advocates for the W. v. Dep't of Justice*, 331 F. Supp. 3d 1150, 1163-65 (D. Idaho 2018)

(noting there exists no known cases limiting privilege only to President's "core powers," collecting

and noting that cases have refused to limit "the presidential communications privilege to

communications regarding quintessential Article II powers, but [instead] have applied it to a

multitude of communications, documents, and circumstances," and holding "the presidential communications privilege is not limited only to quintessential Article II powers"); *United States v. Philip Morris USA (Philip Morris)*, Civ. A. No. 99-2496 (GK), 2004 WL 3253662, at *2 (D.D.C. Sept. 9, 2004) (neither *In re Sealed Case* nor *Judicial Watch II* "turned on the fact that a non-delegable power was in question[;]" presence of non-delegable power was not a "*sine qua non*" of application of the privilege," but instead "a mere coincidence" of the cited cases).[1]  Although the President's entitlement to have the Automotive Report protected by the presidential communications privilege is by no means contingent on the power whose exercise it informed, Plaintiff ignores the nature of the President's duties under Section 232.[2]

---

[1]     Notably, the privilege has frequently been extended in the absence of any assertion of the President's inherent Article II powers.  *See, e.g., Citizens for Responsibility & Ethics in Wash. (CREW) v. DHS*, Civ. A. No. 06-0173 (RJL), 2008 WL 2872183, at *2-3 (D.D.C. July 22, 2008); *Berman v. CIA*, 378 F. Supp. 2d 1209, 1218-22 (E.D. Ca. 2005); *Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, Civ. A. No. 07-4997, 2009 WL 2940204, at *6, *8 (N.D. Cal. Aug. 25, 2009), *as amended* (Sept. 9, 2009); *N.Y. Times Co. v. Dep't of Def.*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007).

[2]     The President's authority under Section 232 overlaps with the exercise of his broader, fundamental constitutional responsibilities.  The statute's title, "Safeguarding national security," reflects Congress' recognition of the constitutional provenance of the President's role under Section 232.  That the Secretary of Defense is the only official singled out for compulsory notification in every Section 232 case further confirms that Congress was serious about the link between certain imports and national security.  *See* 19 U.S.C. § 1862(b)(1)(B).  The same is true of Congress' admonition to the President to "recognize the close relation of the economic welfare of the Nation to our national security . . . in determining whether such weakening of our internal economy may impair the national security[.]" 19 U.S.C. § 1862(d).

       As such, although the President's Section 232 authority flows from a legislative delegation, it plainly relates to his familiar constitutional role in conducting foreign affairs and protecting national security, to include his inherent Article II treaty-making power.  U.S. Const., art. 2, sec. 3; *see also, e.g., Bancoult v. McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006) ("Article II provides allocation of foreign relations and national security powers to the President, the unitary chief executive");  *1st Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972) (plurality opinion) (the President has "the lead role . . . in foreign policy"); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (Article II of the Constitution places with the President the "'vast share of responsibility for the conduct of our foreign relations'") (quoting *Youngstown Sheet & Tube Co.*

Instead, the presidential communications privilege is very broad, applying to documents "that reflect presidential decision-making and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997). The privilege "applies to communications made in the process of arriving at presidential decisions." *N.Y. Times*, 499 F. Supp. 2d at 516 (quoting *In re Sealed Case*, 121 F.3d at 745). It also protects "communications 'in performance of a President's responsibilities,' . . . 'of his office,' . . . and made 'in the process of shaping policies and making decisions.'" *Amnesty Int'l*, 728 F. Supp. 2d at 522 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977)).

The privilege extends beyond direct communications with the President to include communications "solicited and received" by presidential advisors, *see In re Sealed Case*, 121 F.3d at 752, and communications made "in the process of shaping policies and making decisions," *see Nixon*, 433 U.S. at 449. As a member of this Court recently observed, "What matters for purpose of the privilege is who *solicits* the communication, and whether that person also ultimately *receives* it." *Prop. of the People*, 2019 WL 3891166 at *4 (emphasis in original). The privilege also protects "records memorializing or reflecting such communications." *Amnesty Int'l*, 728 F. Supp. 2d at 522; *CREW*, 2008 WL 2872183, at *3. Further, it applies to documents in their entirety. *In re Sealed Case*, 121 F.3d at 744.

For these reasons, there is no barrier to invoking the presidential communications privilege in this case.

ii.     ***Requiring the Automotive Report's Premature Release Will Undermine the Efforts of U.S. Trade Agreement Negotiators and Defeat the Purpose of Section 232.***

---

*v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring)). Negotiating trade agreements to adjust the import of goods that may undermine the nation's economic well-being is one of the major weapons in the presidential arsenal that Congress invoked in Section 232.

Plaintiff wrongly suggests that DOC has ignored Section 232's publication requirement (Pl. Opp. at 2), offering it as an admission by DOC of the impermissibility of its privilege claim. This contention is incorrect, and the inference Plaintiff draws is fatally flawed as a result.

Plaintiff's assertion is wrong:  DOC addressed in detail the publication requirements under Section 232 in its initial moving papers.   Lieberman Decl. ¶¶ 20-21; *see also* 19 U.S.C. § 1862(b)(3)(B); 15 C.F.R. § 705.10(c).  DOC also pointed out that neither Section 232 nor DOC's regulations specify the time at which DOC must make the report publicly available.  Lieberman Decl. ¶ 21.  As such, while the Automotive Report will be made public, there is simply no statutory command that it be made public now.

Moreover, the record is clear why DOC is not making the Automotive Report public at this time.  Pursuant to the Executive Proclamation (Proclamation) that the President issued on May 17, 2019, the USTR is pursuing negotiations of agreements to address the threatened impairment of the national security with respect to automotive imports and must report back within 180 days on his progress, on November 13, 2019.  Lieberman Decl. ¶¶ 26, 32.  The President also noted his authority under Section 232, in the event negotiations do not result in the necessary agreement or agreements, to take such further actions as he deems necessary.  *Id.* ¶ 31.  As such, it is clear from the record that the Report is being actively used by the Executive to conduct foreign relations in the area of trade.[3]

---

[33]      Reminiscent of the sarcastic old saw, "No good deed goes unpunished," Plaintiff cites the Presidential Proclamation, and other statements by the President, as support for the bald assertion that "the President has no confidentiality interest in the report or its content."  Pl. Opp. at 22. Yet, the nature of the statements attributed to the President in Plaintiff's Opposition reflect a spirit consistent with the balance that FOIA is designed to strike.  *See, e.g., Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 712 n.34 (D.C. Cir. 1977)("FOIA should not be construed so as to put the federal bureaucracy in a defensive or hostile position with respect to the Act's spirit of open government and liberal disclosure of information.").  What has been disclosed

This Court has recognized that documents concerning ongoing treaty negotiations with other nations that constitute "inter-agency or intra-agency letters or memorandums" are exempt from disclosure under Exemption 5, as their release could undermine the position of the negotiators. *Fulbright & Jaworski* (*Fulbright*) *v. Dep't of Treasury*, 545 F. Supp. 615, 619-20 (D.D.C. 1982) (holding notes of an agency employee reflecting positions taken and issues raised in treaty negotiations properly withheld pursuant to Exemption 5 because their release would harm the agency's negotiation process); *see also Brayton v. Office of U.S. Trade Representative*, 657 F. Supp. 2d 138, 145 (D.D.C. 2009) (concluding that USTR was entitled to withhold document revealing its own sensitive negotiation position, where document was covered by confidentiality agreement and related to ongoing trade negotiation between the U.S. and European Union), *aff'd*, 641 F.3d 521 (D.C. Cir. 2011).  Here, while the USTR continues negotiations on trade agreements under Section 232, and more broadly while the President considers other actions that he may deem necessary to adjust automotive imports, the disclosure of the Automotive Report, which provides DOC's advice to the President, may compromise these negotiations and the President's overall

---

informs the governed of the doings of its leaders.  Courts ordinarily do not penalize agency offices for sharing information concerning government activities with the public in general terms.  See, e.g., *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. 1993). What has been held back corroborates the sincerity of the government's assertion of need to withhold the recommendations and advice that would undermine the President's ability to negotiate and undertake other measures in order to eliminate the threat to national security revealed by the Secretary's investigation.  A review of the statements claimed to extinguish the President's interest in confidentiality will demonstrate the hyberbole of that assertion.  Disclosing that the Secretary found maintaining a U.S. car industry is "vital to national security" or that "that automobiles and certain automobile parts are being imported in the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States" in no demonstrable way supports Plaintiff's implication that the President waived the presidential communications and deliberative process privileges as to the Automotive Report and the recommendations and advice he received.  *See, e.g.*, *Assassination Archives & Research Ctr. v. CIA*, 334 F.3d 55, 61 (D.C. Cir. 2003)(holding the previous generalized disclosures did not result in waiver because they "did not precisely track the records sought to be released").

ability to execute his statutory responsibilities.  (Lieberman Decl. ¶¶ 22, 38, 39, 40).  When the actions the President has taken or may take are resolved, then the publication of the Automotive Report will no longer jeopardize the U.S. position and it will be made public pursuant to the statute's command.[4]

### iii.   The Automotive Report Meets the Requirements for the Presidential Communications Privilege.

In *Judicial Watch II*, the Department of Justice sought to apply the presidential communications privilege to both the pardon recommendations actually provided to the President at his request and the Department of Justice's internal working documents related to the preparation of the pardon recommendation.  The D.C. Circuit excluded from the reach of the presidential communications privilege the latter category—i.e., documents used in preparing the pardon recommendation, stating:

> extending the presidential communications privilege to working documents produced in the course of advising the President on his pardon power would be inconsistent with the Department's historical approach of invoking the deliberative process privilege rather than the presidential communications privilege to protect its internal documents and deliberations from public disclosure.

Id. (emphasis added for language omitted  by plaintiff).   The *Judicial Watch II* court reinforced the distinction in its final reiteration of the reach of the presidential communications privilege:

> we hold that the presidential communications privilege applies to pardon documents "solicited and received" by the President or his immediate advisers in the Office of the

---

[4]      It is for these reasons that Section 232, which provides the President with broad discretion to engage in the actions he considers necessary to adjust imports, does not require that DOC publish the Report at a particular time, reflecting Congress's evident intent to avoid compromising pending negotiations and fulfillment of other presidential actions.  *Student Loan Mktg. Ass'n v. Riley*, 907 F. Supp. 464, 475 (D.D.C. 1997), *aff'd*, 104 F.3d 397 (D.C. Cir. 1997) (citing *Chevron, U.S.A, Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If a statute is silent or ambiguous on a point, substantial deference must be given to the interpretation of that statute by the agency that is responsible for its implementation. The interpretation given by the agency need not be the only interpretation possible as long as it is a reasonable one.")).

President, and that the deliberative process privilege applies to internal agency documents that never make their way to the Office of the President.

The Automotive Report, like the pardon recommendation, has been "solicited and received" by the President. Therefore, this Circuit's holding in *Judicial Watch II*, which discussed the scope of the presidential communications privilege, supports DOC's invocation of the privilege rather than undermining it. *See, e.g., EPIC*, 320 F. Supp. 3d at 116 (agreeing that predictive analytics report prepared by the Department of Justice was protected by presidential communications privilege when it was "solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate") (quoting *In re Sealed Case*, 121 F.3d at 750).

The Automotive Report was indisputably "solicited and received" by the White House pursuant to Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. 1862. (Lieberman Decl. ¶¶ 6, 23, Ex. 6). It memorializes DOC's presentation and analysis of data concerning whether the importation of automobile and automobile parts threatens to impair the national security and recommended actions to prevent the threatened impairment. (*Id.* ¶¶ 6, 22, 25). Currently, pursuant to the Proclamation, the USTR is using the Automotive Report in connection with the negotiation of agreements with foreign powers to address this threatened impairment and must report back to the President within 180 days of the issuance of the proclamation, on November 13, 2019. (*Id.* ¶¶ 6, 26, 31-32). Disclosing the Automotive Report during this negotiation period, or until the resolution of any additional actions the President may take under Section 232, would disrupt or undermine the government's efforts to eliminate the threatened impairment to national security. (*Id.* ¶¶ 37-39). Accordingly, the Automotive Report meets the requirements for the presidential communications privilege and DOC properly invoked the privilege.

C.     **DOC Properly Invoked the Deliberative Process Privilege.**

Plaintiff asserts (Pl. Opp. at 23-24) that DOC did not describe a specific agency decision-making process implicated by the Automotive Report. Plaintiff also asserts (Pl. Opp. at 24-25) that the Report cannot be pre-decisional because it must eventually be published in the Federal Register. (*Id.*) Neither of these arguments has merit.

First, Plaintiff is wrong to say that the President's use of the analysis and recommendations embodied in the Automotive Report for decision-making does not meet the requirements of the deliberative process privilege. The Automotive Report was created for, and reviewed by, the President and his advisers, who is the ultimate decision-maker under Section 232. As demonstrated by the Lieberman Declaration, the President specifically solicited this Section 232 investigation and Report from DOC. (Lieberman Decl. ¶ 23, Ex. 6). Further, the Automotive Report reflects DOC's findings and recommendations for action regarding whether the imports at issue represent a threat to national security for the President's considerations.

Although Section 232 requires that the Automotive Report be published, it does not specify that publication occur before the President has completed the decision-making process. Prematurely publishing the Automotive Report would alert U.S. concerns and strategies to other nations, thus undercutting the U.S. in trade agreement negotiations, as well as revealing information pertaining to other potential courses of action that the President has still to consider. *See Fulbright*, 545 F. Supp. at 620. ("The policies behind the deliberative process privilege support non-disclosure. Much harm could accrue to the negotiations process if these notes were revealed").[5]

---

[5]     Further, courts have consistently interpreted FOIA to prevent placing the government in a disadvantageous negotiating position. *See, e.g., Fed. Open Market Comm. v. Merrill*, 443 U.S. 340 (1979).

Second, Plaintiff argues (Pl. Opp. at 24-25) that the Automotive Report cannot be "pre-decisional" because, since it must ultimately be published, it constitutes a final agency position. This, however, is not the case. It is well-settled that "pre-decisional" documents are those "prepared in order to assist an agency decisionmaker in arriving at his decision rather than to support a decision already made." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002) (citations omitted). Here, the President, not DOC, makes the final decision as to trade agreements, and no final decision has yet been made. In the Proclamation, the President directed the USTR to seek negotiation of agreements concerning the imports at issue and update him in November 2019 of his progress. The President has also indicated further actions may be necessary. During this time, the President and his advisers may need to further consult, debate, deliberate over and choose advice embodied in the Automotive Report to be pursued.

**D.    *Withholding Public Release of the Automotive Report Section 232 Until Resolution of the Actions Required to Adjust Automotive Imports Under Section 232 Comports With the Purposes Underlying the Privileges DOC Has Invoked.***

Plaintiff's reliance on Section 232's publication requirements to defeat the Government's privileges is misplaced. Section 232's publication requirement is unambiguous and has been routinely satisfied by DOC. Plaintiff's assertion (Pl. Opp. at 26) that "the information is coming out" is not disputed. What is disputed is the wholly unsupported suggestion that the Automotive Report should be published now. It finds support in neither the statute's plain language, the design of the statutory scheme, nor logic and good sense.

**i.    *Section 232 Contains No Date By Which DOC Must Publish the Automotive Report, Yet Contains Specific Timetables for its Other Statutory Directives.***

In one form or another, Plaintiff insists throughout its brief (Pl. Opp. at 14, 17, 19) that, because Congress delegated responsibility to, and created specific statutory roles for, the President and DOC to take actions to ameliorate the impact of certain imports on our national security,

Congress can limit the Executive's privileges associated with the advice and recommendations solicited and received by the President.[6]   Section 232 delineates a specific timetable for action by both DOC and the President and, in light of the importance of his mandate, gives the President an additional amount of unspecified time to take whatever steps prove necessary to meet the threat. Section 232's initial timetable will not expire until November 13, 2019, when the USTR must update the President on the status of negotiations.   (Lieberman Decl. ¶¶ 14-15, Ex. 8 (Proclamation)).

In addition to establishing a procedure with initial deadlines for addressing the national security implications of the potentially harmful importation of certain articles of commerce, Section 232 also calls for the publication of the Report, including its advice and recommendations, in the Federal Register.   Unlike the procedures mentioned above, there is no timetable for publication of the Report as Plaintiff acknowledges.

Because the relevant statute provides a timetable for certain actions, but not the publication of a report under 19 U.S.C. § 1862(b)(3)(A), DOC and the President reasonably understand Section 232 to confer discretion over the Report's release to a time when the very interests promoted by the asserted privileges and the design of the Act would not be harmed.   Similarly, this reasonable understanding affords the President sufficient time and space to gather information from knowledgeable sources, execute the plan that Congress calls upon him to develop, monitor the progress of those efforts, and be prepared to escalate to additional solutions should the initial plan fail.

---

[6] See also *id.* at 19 ("Because the President's Section 232 authority is solely a creature of statutory delegation, Congress retains the power to condition the exercise of that authority, including mandating disclosure of material that Commerce creates for use by the President."); *id* at 14 (congressional delegation of power conditioned, among other things, on publication of report in Federal Register).

There is nothing in Section 232 suggesting that Congress intended to give comfort to the United States' adversaries or to limit the effectiveness of the President's plans by forcing them to be made prematurely public.  Had Congress wished to compel the President to make available to America's economic adversaries the advice and recommendations he solicited and received to beat back a threat to national security from the very sources that pose it, surely Congress would have clearly stated.  But Plaintiff cites nothing that evinces such a counterintuitive Congressional intent.  Indeed, the statute's plain language, its purpose, and logic contradict Plaintiff's unsupported contention.

In drafting Section 232, Congress gave DOC 270 days from a triggering event to conduct, investigate and submit his findings, conclusions, recommendations and advice to the President.  19 U.S.C. §1862(b)(3)(A).  It gave the President 90 days thereafter to determine whether he concurs with the finding of DOC and, if so, to "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. §1862 (c)(1)(A).  Should he choose to take action to adjust imports, he must do so within 15 days of the date of his determination of concurrence with DOC's recommendations.  19 U.S.C. §1862 (c)(1)(B).  The President has 30 days from that same date to report to Congress his decision and the reasons therefore.  19 U.S.C. §1862 (c)(2).  If he chooses, instead, to negotiate an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security, the President has 180 days to negotiate and, if completed, evaluate the

effectiveness of the agreement negotiated in eliminating the national security concerns that justified his action in the first place.  19 U.S.C. §1862 (c)(3)(A).[7]

Given Section 232's detailed timetable, no doubt exists that Congress knew well how to set deadlines it wanted to impose.  Although Plaintiff acknowledges that there is no publication deadline in the statute (Pl. Opp. at 3) and the initial timetable in which the President has been charged by Congress to work on safeguarding national security interests has yet to lapse, Plaintiff remarkably suggests that DOC is delinquent in publishing the Report without identifying a date on which publication of it was due.

> ii.     *Plaintiff's Reliance on the Publication of Other Reports Under Section 232 Is Misplaced.*

Plaintiff also fails in its attempt to find meaning from the timing of other reports' publications.  *See* Pl. Opp. at 26, 31.  For one thing, the Court has no way of knowing whether any of those more quickly published reports implicated the interests at stake here.  Moreover, if anything, the fact that both this administration and prior administrations published most Section 232 reports expeditiously suggests that there is no dilatory strategy at work; instead, the better inference is that publication is delayed and reports are withheld in rare instances (as the statue permits) to avoid a premature disclosure that could harm the interests Section 232 and the Exemption 5 privileges are in place to protect.[8]

---

[7]     If, after that 180 days (or 540 days in total) lapses, "the President shall take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security."  19 U.S.C. §1862 (c)(3).

[8]     Without asserting that the Report *must be published* within a month of its submission to the President, Plaintiff informs the Court (Pl. Opp. at 3) that the Secretary's reports on steel and aluminum *were published* within one month of their submission to the President.  Plaintiff also suggests (Pl. Opp. at 31) that 3 of 22 reports over the years were published contemporaneously with their submission to the President and that another 17 of 22 were "published by their point after the creation."  But, especially without information closing the inferential gap, the handling

### iii.   *Plaintiff's Temporal Limitation Arguments Are Unsupported and Internally Contradictory.*

Plaintiff's next argues that because the privileges implicated generally have no temporal limitation, and because the Report must be published at some point in time, it cannot be privileged. Pl. Opp. at 26-32.  Specifically, Plaintiff contends that "documents shielded by executive privilege remain privileged even after the decision to which they pertain may have been effected" and that privileges are "not list simply . . .  because of the passage of time."  From these unremarkable points, Plaintiff makes the leap that "[i]f [DOC] is correct that either privilege applies, they will apply even after the President decides whether to impose tariffs."  Because Section 232 mandates publication, subject to withholding classified and/or proprietary information, Plaintiff reasons there can be no privilege.  But this "rule" is merely a product of Plaintiff's own creative imagination and not the holding in any case cited.

Moreover, Plaintiff's arguments are internally contradictory.  Plaintiff suggests earlier in its Opposition that Congress has the power to limit the Executive's privileges (Pl. Opp. at 17), but it ignores this suggestion when contending that there can be no temporal limitation as to the Executive's privileges.  Without conceding that correctness of Plaintiff's suggestion that the Legislative Branch can limit the privileges of the Executive Branch, Plaintiff's internally confused presentation merely establishes that it has no reasoned basis to contend that the congressional

---

of similar documents in different cases is of little consequence.  It is well-settled that "agencies may make discretionary disclosures of exempt information, as matter of their administrative discretion, where they are not prohibited from doing so."  *Chrysler v. Brown*, 441 U.S. 281, 293 (1979).  Doing so effects no form of waiver.  *See Mobil Oil Corp. v. EPA*, 879 F.2d 698 (9th Cir. 1989) (finding "no case . . . in which the release of certain document waived the exemption as to other documents"); *see also Salisbury v. United States*, 690 F.2d 966, 971 (D.C. Cir. 1983) ("Disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case.").

mandate to publish the Report at some point in time limits the Executive's power to shield it from production when it is being actively used in a Presidential decisionmaking process.

That Congress requires that DOC publish its report at a point in the future does not deny the viability of the privilege up until that point.  This result is also consistent with decisions recognizing that "even if [a] document is pre-decisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp., v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Once Section 232's mandate has been satisfied, not only is the reason to protect the substance of a report's recommendations and advice no longer it at zenith, but its implementation may have well converted advice into policy.[9]

While DOC has described in detail the risks of prematurely releasing the Report and its roadmap for the Executive's negotiations, Plaintiff has brought forth no authority to refute it.  Nor has Plaintiff provided any basis for concluding that DOC has defaulted on its statutory publication obligation.  It does not explain why the very power it said Congress has to limit the privilege does not permit it to temporally limit the privilege.  And it offers no explanation for why the temporal limitation—and hence the putative date of publication of the Report in the Federal Register— should not coincide with the conclusion of the trade-related national security negotiations and/or other measures that the naturally arising privileges and purpose of Section 232 would protect.

---

[9]     This approach is also consistent with the FOIA Improvement Act of 2016, Pub. L. No. 114-85, 130 Stat. 538, which requires agencies to release documents otherwise privileged when they cannot articulate a reasonably foreseeable harm that would result from disclosure, including due to the passage of time.  See 5 U.S.C. §552(a)(8)(A).

> iv.    *Application of the Deliberative Process Privilege Here is Consistent With the Interests it is Designed to Protect.*

Three undergirding purposes have been historically cited in support of the deliberative process privilege.  All three further the outcome that DOC urges here. Sitting *en banc*, the D.C. Circuit explained "[t]here are essentially three policy bases for this privilege:"

> First, it protects creative debate and candid consideration of alternatives within an agency, and, thereby, improves the quality of agency policy decisions.  Second, it protects the  public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon. And third, it protects the integrity of the decision-making process itself by confirming that "officials should be judged by what they decided[,] not for matters they considered before making up their minds."

*Jordan v. Dep't of Justice*, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (*en banc*).  First, if DOC officials with deep expertise in the substance underlying the Report knew that they were not going to be able to keep their advice and recommendations confidential for at least the duration of the negotiations and potential implementation of other measures, there is a considerable risk of advisors' becoming reluctant to put pen to paper only to place the adversaries (whose acts prompted the Section 232 investigation and Report) in an advantageous position to game the system and learn the United States' confidential plans, strategy, and tactics without exposing their own.

Second, until implementation, the advice and recommendations are a series of fluid and presumably changing options for the President's consideration.  Publishing the Automotive Report immediately upon submission to the President would make little sense in an adversarial context. Because the President is not required to decide whether or not he agrees with DOC's advice and recommendations by that time, there is considerable risk of confusion by exposing to public view options that will not ultimately be pursued.  Waiting until the conclusion of the initial negotiations or further measures that are at the core of Section 232's purpose avoids this illogical result.

Finally, the privilege protects the integrity of the decision-making process itself by confirming that "officials should be judged by what they decided, not for matters they considered before making up their minds." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).   Moreover, as the Supreme Court has aptly observed, "Exemption 5, properly construed, calls for disclosure of all opinion and interpretations which embody the agency's effective law and policy, and  the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what it shall be." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975).  Holding the  publication of the Automotive Report until the final conclusion of the action taken on auto imports corresponds elegantly to the policies behind the privileges.

## E.      DOC Has Complied With FOIA's Segregability Requirement.

Plaintiff argues that DOC has failed to show that the agency has met its duty to disclose all reasonably segregable content of the Automotive Report.

When an agency has validly withheld information, it must demonstrate that all reasonably segregable material has been released.  5 U.S.C. § 552(b).  Courts are required to find expressly that the agency produced all reasonably segregable portions of a record.  *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007).  In making such a finding, courts recognize that "agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshalls Serv*., 494 F. 3d 1106, 1107 (D.C. Cir. 2007).  To establish that all reasonably segregable, non-exempt information has been disclosed, the agency need only show "with reasonable specificity" that the information withheld cannot be further segregated. *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Once the agency has provided this information, it is "entitled to a presumption that it complied with the obligation to disclose reasonably segregable material.  The plaintiff must then produce a 'quantum of evidence' to rebut this presumption, at which point 'the burden lies with the

government to demonstrate that no segregable, nonexempt portions were withheld.," *Am. Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 306  (D.D.C. 2018) (quoting *Sussman*, 494 F.3d at 1117).

In its moving papers, DOC explained that it was withholding the entirety of the Automotive Report pursuant to the presidential communications and deliberative process privileges.  It further specified that the Report contained DOC's analysis and presentation of market, economic, statistical and other data and information from DOC and other governmental and non-governmental sources, include  proprietary sources, relating to whether the importation of automobiles and automobile parts threatens to impair U.S. national security.  DOC also set forth the reasoning underlying its findings and recommendations.  (Lieberman Decl. ¶¶ 6-7, 35).  DOC noted that, as the President "solicited  and received" the Automotive Report for use in connection with the execution of his responsibilities under Section 232, it determined the entirety of the Report was subject to the presidential communications privilege.  (*Id.* ¶¶ 37-39).  DOC also noted that the deliberative process privilege applies because the Report contains analysis and findings for the President to consider in connection with his Section 232 decision-making, which information is pertinent to the USTR's ongoing negotiation of agreements intended to adjust the importation of the targeted products and such further action as the President may deem necessary.  (*Id.* ¶¶ 40-42).  Additionally, DOC indicated that it had conducted a careful review of the Automotive Report, finding that the withheld information is so inextricably intertwined with nonexempt information such that segregation would result in a meaningless set of words or phrases that have no or minimal information content.  (*Id.* ¶ 43).

Plaintiff has failed to provide evidence to overcome the presumption that DOC complied with its obligation to disclose all reasonably segregable portions of the Automotive Report, which

DOC acknowledges it withheld in entirety for the reasons stated in the Lieberman Declaration.   Rather, Plaintiff has only reiterated (Pl. Op. at 33) variations of its arguments against the application of the presidential communications privilege or deliberative process privilege.   For example, Plaintiff argues that because the Automotive Report will ultimately be published, "Section 232 already anticipates that its reports will be segregable because Commerce may redact only 'classified' and 'proprietary' information before publication in the Federal Register."   DOC has already addressed those arguments above.   Accordingly, in the absence of evidence from Plaintiff to rebut the presumption that DOC has complied with this duty, the Court should conclude that DOC has satisfied its segregability obligations.


*     *     *

## CONCLUSION

For the foregoing reasons, and those set forth in DOC's motion, DOC respectfully requests that the Court grant summary judgment in its favor and deny Plaintiff's motion for summary judgment.


Dated:  September 17, 2019


Respectfully submitted,

JESSIE K. LIU, D.C. Bar # 472845
United States Attorney for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

By: */s/ John Moustakas*
John Moustakas, D.C. Bar #442076

Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 252-2518
john.moustakas@usdoj.gov

*Counsel for Defendants*