**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| CAUSE OF ACTION INSTITUTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-0778-CJN |
| | ) | |
| U.S. DEPARTMENT OF COMMERCE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**PLAINTIFF CAUSE OF ACTION INSTITUTE'S SUPPLEMENTAL BRIEF**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Ryan P. Mulvey (D.C. Bar No. 1024362)
R. James Valvo, III (D.C. Bar No. 1017390)
Lee A. Steven (D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
james.valvo@causeofaction.org
lee.steven@causeofaction.org

*Counsel for Plaintiff*

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................... iii

Introduction ....................................................................................................................... 1

Argument ........................................................................................................................... 2

I.   The OLC Opinion materially impacts this lawsuit and contains important
     concessions that should affect the Court's analysis. ......................................... 3

     A.   The OLC Opinion offers arguments about the use of executive privilege
          relevant under the FOIA. ...................................................................... 3

     B.   The OLC Opinion concedes that waiver applies to portions of the Auto
          Tariffs Report and that the report does not contain classified information. .............. 4

II.  The OLC Opinion offers no compelling justification for withholding the Auto
     Tariffs Report under executive privilege. ........................................................... 6

     A.   The OLC Opinion mischaracterizes secretarial reports and relies on inapt
          history to support the government's misuse of the presidential-communications
          privilege. ............................................................................................. 6

     B.   The OLC Opinion confuses the interplay of the presidential-communications
          and deliberative-process privileges. ...................................................... 9

     C.   The OLC Opinion confuses the President's exercise of delegated tariff
          authority with his inherent responsibility for ongoing diplomatic negotiation
          and the conduct of foreign affairs. ...................................................... 10

     D.   The OLC Opinion is wrong about statutorily required reporting. .......................... 11

III. Section 232 leaves little room for delay in publishing a secretarial report ...................... 12

     A.   Statutory History .................................................................................. 13

     B.   Past and Current Practice ...................................................................... 14

     C.   Common Sense ...................................................................................... 17

IV.  Commerce improperly withheld portions of the Auto Tariffs Report when it
     submitted *ex parte* a copy of the report for *in camera* review. .......................... 18

Conclusion ...................................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Executive Office of the President,*
    97 F.3d 575 (D.C. Cir. 1996) ................................................................19

*Atlantic Cleaners & Dyers, Inc. v. United States,*
    286 U.S. 427 (1932) ............................................................................13

*Barenblatt v. United States,*
    360 U.S. 109 (1959) ............................................................................12

*Cause of Action Institute v. Department of Commerce,*
    No. 19-2698 (D.D.C. filed Sept. 9, 2019) ..............................................17

*Center for Effective Government v. Department of State,*
    7 F. Supp. 3d 16 (D.D.C. 2013) ........................................................5, 8

*Electronic Privacy Information Center v. Department of Justice,*
    320 F. Supp. 3d 110 (D.D.C. 2018) ......................................................3

*Federal Trade Commission v. Grolier, Inc.,*
    462 U.S. 19 (1983) ..............................................................................3

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ............................................................................13

*Judicial Watch, Inc. v. Department of Justice,*
    365 F.3d 1108 (D.C. Cir. 2004) ........................................................8, 9

*Judicial Watch, Inc. v. Department of Justice,*
    No. 01-639, 2006 WL 2038513 (D.D.C. July 19, 2006) ..........................9

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281 (1988) ............................................................................13

*Lamie v. United States Trustee,*
    540 U.S. 526 (2004) ............................................................................14

*Lardner v. Department of Justice,*
    No. 03-0180, 2005 WL 758267 (D.D.C. Mar. 31, 2005) ........................3

*Loving v. Department of Defense,*
    496 F. Supp. 2d 101 (D.D.C. 2007) ....................................................10

*National Labor Relations Board v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) ................................................................................................19

*National Treasury Employees Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ..................................................................................9

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................................5, 8, 9

*In re Sealed Case*,
    676 F.2d 793 (D.C. Cir. 1982) ..................................................................................5

*Senate of the Commonwealth of Puerto Rico v. Department of Justice*,
    823 F.2d 574 (D.C. Cir. 1987) ................................................................................10

*United States v. Nixon*,
    418 U.S. 683 (1974) ..................................................................................................8

*United States v. Reynolds*,
    345 U.S. 1 (1953) ....................................................................................................20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..................................................................................................9

**Statutes**

5 U.S.C. § 552(a)(4)(B) ..................................................................................................19

5 U.S.C. § 603 ..................................................................................................................9

5 U.S.C. § 604 ..................................................................................................................9

19 U.S.C. § 1862(b) ........................................................................................................10

19 U.S.C. § 1862(b)(1)(A) ..............................................................................................13

19 U.S.C. § 1862(b)(3)(B) ........................................................................................13, 19

19 U.S.C. § 1862(c) ........................................................................................................10

19 U.S.C. § 1862(c)(1)(A) ................................................................................................6

19 U.S.C. § 1862(c)(1)(B) ................................................................................................6

19 U.S.C. § 1862(c)(2) ..............................................................................................15, 16

19 U.S.C. § 1862(c)(3)(A) ..........................................................................................6, 16

19 U.S.C. § 1862(c)(3)(B) ................................................................................................6

iv

19 U.S.C. § 1862(d)′ ...............................................................................13, 15

19 U.S.C. § 1862(d)′(1) ..................................................................................13

42 U.S.C. § 4332 ..............................................................................................9

50 U.S.C. § 4502 ............................................................................................18

50 U.S.C. § 4555(a) ........................................................................................19

50 U.S.C. § 4555(d) ...................................................................................1, 18

**Regulations**

15 C.F.R. § 705.10 ..........................................................................................13

15 C.F.R. § 705.12 ..........................................................................................13

40 C.F.R. pt. 1501 ............................................................................................9

**Session Laws**

Federal Reports Elimination and Sunset Act of 1995, Pub. L. No. 104-66,
109 Stat. 707 ..............................................................................................16

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418,
102 Stat. 1107 .......................................................................................13, 15

Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872 ..................13

**Other Authorities**

Adjusting Imports of Aluminum into the United States,
83 Fed. Reg. 11,619 (Mar. 15, 2018) ........................................................17

Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles
into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020) ......................17

Adjusting Imports of Steel into the United States,
83 Fed. Reg. 11,625 (Mar. 15, 2018) ........................................................17

Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383 (1974) .........12

Department of Commerce, The Effect of Imports of Aluminum on the National
Security (Jan. 17, 2018) .............................................................................16

Department of Commerce, The Effects of Imports of Steel on the National
Security (Jan. 11, 2018) .............................................................................16

Letter from the Hon. Michael B. Mukasey, U.S. Attorney General,
to the Hon. Harry Reid, U.S. Senate (Nov. 14, 2008) ............................................................8

Office of Info. Policy, Dep't of Justice, *Litigation Review: History of Exemption 1 Disclosure Orders (FOIA Update, vol. XVI, No. 2)* (Jan. 1, 1995),
http://bit.ly/2Td4QeN...................................................................................................20

Office of Legal Counsel, Dep't of Justice, *Assertion of Executive Privilege for Memorandum to the President Concerning Efforts to Combat Drug Trafficking* (Sept. 30, 1996) ....................................................................................7

Office of Legal Counsel, Dep't of Justice, *Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request* (June 19, 2008) ...............................................7

Office of Legal Counsel, Dep't of Justice, *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions* (July 31, 1989) ..........................................................................................12

Office of Legal Counsel, Dep't of Justice, *Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security* (Jan. 17, 2020) ................................................................... *passim*

Petroleum Import Adjustment Program, 45 Fed. Reg. 22,864 (Apr. 3, 1980) .............................14

Publication of Report of Investigation to Determine the Effects on the National Security of Oil Imports, 44 Fed. Reg. 18,818 (Mar. 29, 1979)................................................14

White House, Memorandum On the Effect of Uranium Imports on the National Security & Establishment of the U.S. Nuclear Fuel Working Group (July 12, 2019) ......................................................................................................17

## INTRODUCTION

At the end of last year, Congress passed and President Trump signed into law an appropriations bill that included a provision requiring Defendant Department of Commerce ("Commerce") to publish within thirty days a report prepared under Section 232 of the Trade Expansion Act of 1962 ("Section 232") about the national security impact of the importation of automobiles and automobile parts ("Auto Tariffs Report").  Plaintiff Cause of Action Institute ("CoA Institute") requested the same report under the Freedom of Information Act ("FOIA") in February 2019 and filed this lawsuit after Commerce failed to issue a timely determination.

Despite the congressionally mandated publication deadline having passed over a month ago, Commerce still has not—and says it will not—release the Auto Tariffs Report.  The agency defends its intransigence by asserting that the White House has directed it to keep the report secret until "executive privilege" is deemed no longer to apply.[1]  The basis for that position is set out in a January 2020 Office of Legal Counsel opinion (the "OLC Opinion") that Commerce has adopted, and which the Court has reviewed.  The reasoning in that opinion is flawed and does not support withholding the report at issue from CoA Institute.

These developments mark an important turning point in this lawsuit.  Until now, Commerce has not directly challenged the constitutionality of Section 232's *Federal Register* publication requirement.  No longer.  The OLC Opinion is a frontal assault on Congress's authority to condition its delegation of tariff authority to the President on the publication of a report.  And it seeks to articulate a novel understanding of executive privilege that ignores the law and past practice, without a limiting principle.  This Court should reject the OLC Opinion's conclusions

---

[1] Commerce also asserts, for the first time, that the Defense Production Act, 50 U.S.C. § 4555(d), allows it to withhold information in the report from this Court, despite FOIA's regularly relied upon *in camera* review provision.  *See infra* at pp. 18–20.

and order the government to promptly produce the Auto Tariffs Report, subject only to redaction of proprietary and classified information, as contemplated by Section 232.

## ARGUMENT

In the parties' last Joint Status Report, Commerce "confirmed that, in accordance with the January 17, 2020 OLC Opinion, [it] will continue to withhold the [Auto Tariffs Report] until [executive] privilege is deemed no longer applicable." ECF No. 31 at 2. Following a second oral hearing earlier this month, the Court ordered supplemental briefing on the import of the OLC Opinion to this case, as well as other issues the parties may wish to elaborate upon.

The release of the OLC Opinion, and Commerce's reliance on it as a basis for refusing either to publish the Auto Tariffs Report in the *Federal Register* or to release it under the FOIA, bear directly on this lawsuit. The OLC Opinion provides detailed insight into the Administration's incorrect view of how Section 232 operates and whether and when "executive privilege"—either generally or vis-à-vis the presidential-communications or deliberative-process privileges—can keep agency records secret and out of the reach of Congress or the public.

As explained below, the OLC Opinion's reasoning is infirm and the Court should reject it. Commerce must publish the Auto Tariffs Report in the *Federal Register* and cannot rely on executive privilege, in conjunction with Exemption 5 of the FOIA, to continue to withhold it from CoA Institute. Commerce also improperly withheld portions of the report in its *ex parte* submission and thereby deprived the Court of the ability to conduct thorough *in camera* review.

I.      **The OLC Opinion materially impacts this lawsuit and contains important concessions that should affect the Court's analysis.**

      A.      **The OLC Opinion offers arguments about the use of executive privilege relevant under the FOIA.**

When an agency attempts to withhold records under Exemption 5 of the FOIA, the applicable standard entails an examination of whether "the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance." *Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 23–28 (1983).  This "routine disclosure" rule distinguishes the FOIA context from standard civil discovery and therefore eliminates the distinction between qualified and absolute privileges. As for the presidential-communications and deliberative-process privileges, the "routine disclosure" rule also means that an agency need not prove that the President—with presidential communications—or a high-ranking agency official—with deliberative processes—*actually* invoked the privilege. *See Elec. Privacy Info. Ctr. v. Dep't of Justice*, 320 F. Supp. 3d 110, 117 (D.D.C. 2018) [hereinafter *EPIC*].  In effect, the procedural niceties of civil discovery do not apply.

Even so, while "the *manner* in which [an] exemption is raised" may not matter under the FOIA, courts must still attend to the "*content or nature* of a document generally" to determine whether it would be "routinely" privileged.  *Lardner v. Dep't of Justice*, No. 03-0180, 2005 WL 758267, at *7 (D.D.C. Mar. 31, 2005).  This is so for both the deliberative-process privilege, *EPIC*, 320 F. Supp. 3d at 117 (citation omitted), and the presidential-communications privilege.  *Id.* (citing *Lardner*, 2005 WL 758267, at *6–10).

Here, the OLC Opinion frames Congress's efforts to enforce Section 232's publication requirement—and, indirectly, CoA Institute's request for disclosure under FOIA—in terms of qualified privilege and whether there is "legitimate justification for intruding upon the confidentiality of the Executive Branch."  Office of Legal Counsel, Dep't of Justice, *Publication*

*of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security* at 22 (Jan. 17, 2020) [hereinafter OLC Opinion], *available at* http://bit.ly/32hPREQ.  But that framing confuses the issue.  The question here is whether Section 232 reports *as such* are presumptively subject to executive privilege.  Or whether, as CoA Institute has previously argued, Congress has directed Commerce to create those reports outside the scope of the privilege, given the nature of their creation and purpose in the exercise of congressionally delegated tariff authority.  If the OLC Opinion is wrong about the nature, content, and purpose of secretarial reports, Commerce's Exemption 5 arguments must fail.

### B.    The OLC Opinion concedes that waiver applies to portions of the Auto Tariffs Report and that the report does not contain classified information.

The OLC Opinion contains two remarkable concessions that affect this case.  *First*, the OLC Opinion concedes that the government waived its ability to exert executive privilege over the portions of the Auto Tariffs Report described or quoted in President Trump's May 2019 proclamation: "The proclamation's summary of and quotation from certain portions of the report did not waive or forfeit executive privilege over the remainder of the report."  *Id.* at 10 n.7 (citation omitted); *see generally* Tr. of [Second] Mot. Hr'g at 37:17–38:04 (Feb. 6, 2020) [hereinafter 2d Tr.], ECF No. 32.  Despite CoA Institute raising waiver in the previous round of briefing, and the Court's continued attempts to solicit the government's views, defense counsel has not articulated a clear-cut position on the import of the May 2019 proclamation.  *See* 2d Tr. at 37:15 ("MR. MOUSTAKAS: I have not given thought to that [question of waiver].");  Tr. of [First] Mot. Hr'g at 28:14–17 (Nov. 21, 2019) [hereinafter 1st Tr.], ECF No. 29 ("MR. MOUSTAKAS: I would want to give a little bit more thought to that.  I have said very quickly it's waivable because, obviously there are situations where, clearly, it's waivable.");  *id.* at 32:07–12 ("[I]n all candor, . . . as a practical matter, direct quotes, I think the courts have said, are sort of free game.").

This is not a difficult issue, and the law is straightforward. "[A]ny voluntary disclosure . . . to a third party breaches . . . confidentiality . . . and therefore waives the privilege[.]" *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982). To be sure, executive privilege exists "'to aid the government decisionmaking process, [and] a waiver should not be lightly inferred.'" *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (citation omitted). And, in the context of the deliberative-process and presidential-communications privileges, courts should avoid an "all-or-nothing" approach where waiver extends to "related materials." *Id.* But the public release of the contents of the Auto Tariffs Report, in extensive summary form and through direct quotation, meets the otherwise high bar for the waiver of executive privilege. "[T]he White House has waived its claims of privilege in regard to the specific documents that it voluntarily revealed to third parties outside the White House[.]" *Id.* at 741–42; *see Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 26 (D.D.C. 2013) ("Although . . . disclosure of portions of a document subject to the presidential communications privilege does not waive the privilege as to the entire document, . . . the widely publicized nature of [a document] is important in considering the confidentiality interests implicated by the [document's] disclosure under FOIA.").

*Second*, the OLC Opinion concedes that the Auto Tariffs Report does not contain classified information. *See* OLC Opinion at 6 ("[T]he report contains proprietary information but not any classified information."). But if the report contains no classified content, how can there be a compelling national security reason for continued secrecy? *Cf.* OLC Opinion at 18 (arguing "Congress acknowledged" a "legitimate confidentiality interest" of the Executive Branch "by excluding classified information from [Section 232's] publication requirement"). The OLC Opinion tries to divert attention by mischaracterizing the nature of secretarial reports and

improperly recasting the President's decision-making under Section 232 as an exercise of his authority to conduct diplomacy or act as Commander in Chief. *See id.* at 12–14.

## II.   The OLC Opinion offers no compelling justification for withholding the Auto Tariffs Report under executive privilege.

### A.   The OLC Opinion mischaracterizes secretarial reports and relies on inapt history to support the government's misuse of the presidential-communications privilege.

The OLC Opinion describes the Autos Tariffs Report as a "quintessential privileged presidential communication[.]" OLC Opinion at 7.  CoA Institute has already explained why this cannot be so.  *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Cross-Mot. for Summ J. at 13–23 [hereinafter Pl.'s Cross-Mot.], ECF No. 24; *see also* Pl.'s Reply in Supp. of its Cross-Mot. for Summ. J. at 7–13 [hereinafter Pl.'s Reply], ECF No. 27.  But the OLC Opinion offers two additional points that should be addressed.

*First*, the OLC Opinion claims the use of the presidential-communications privilege is "not affected by the fact that the [Auto Tariffs Report] reflects the exercise of statutory authority delegated to the President pursuant to Congress's constitutional powers[.]" OLC Opinion at 8. But a secretarial report does *not* reflect the exercise of statutory authority delegated to the President because, under Section 232, presidential decision-making only starts *after* the Secretary has completed *his* investigation and finalized *his* report and recommendation.  *See* 19 U.S.C. § 1862(c)(1)(A).  The Auto Tariffs Report does not provide insight into what the President will do or how he will do it, especially since Section 232 provides various avenues for potential action, including the imposition of tariffs/import adjustments, *id.* § 1862(c)(1)(B); renegotiation of existing agreements, *id.* § 1862(c)(3)(A); or even *no* action. *Id.* § 1862(c)(3)(B).  Instead, the Auto Tariffs Report reflects Commerce's exercise of its statutory authority to investigate the impacts of imports and to prepare a report.

6

While dismissing the relevance of the underlying delegation of tariff authority, the OLC Opinion also relies on irrelevant authorities that betray Commerce's efforts to mischaracterize the nature of secretarial reports. For example, previous OLC opinions on the application of executive privilege "to communications concerning the execution of statutes," OLC Opinion at 8, each addressed Congress's efforts to obtain via subpoena—and pursuant to Congress's investigative and oversight authority—*organically created* Executive Branch documents, including those which reflected solicited legal advice.[2] In those cases, the White House was never "on notice" that the subpoenaed records would ever be discoverable, and creation of the records was never required by statute. Here, by contrast, the Auto Tariffs Report would not exist *but for* Congress's delegation. Commerce (and the President) have always known that the report must be published, so there is no cognizable "chill" argument. And again, the Auto Tariffs Report does not provide insight into presidential decision-making but reflects Commerce's findings and recommendations.

*Second*, and relatedly, the OLC Opinion claims executive privilege has been used to protect the "confidentiality of communications regarding the President's use of his section 232 authority." OLC Opinion at 9. Although that is true, it is irrelevant here because those "communications" *never* included a secretarial report. In the lone example cited in the OLC Opinion, a House subcommittee had subpoenaed documents reflecting White House deliberations *after* the disposition of a secretarial investigation and long *after* the secretarial report had been published in the *Federal Register*. *See* 2d Tr. at 16:13–17:10; *see also infra* at p. 14.[3] Although executive

---

[2] Office of Legal Counsel, Dep't of Justice, *Assertion of Executive Privilege Over Communications Regarding EPA's Ozone Air Quality Standards and California's Greenhouse Gas Waiver Request* (June 19, 2008), *available at* http://bit.ly/3c6VQ3E; Office of Legal Counsel, Dep't of Justice, *Assertion of Executive Privilege for Memorandum to the President Concerning Efforts to Combat Drug Trafficking* (Sept. 30, 1996), *available at* http://bit.ly/3cdDoGv.

[3] The memorandum about Congress's attempt to subpoena records from the Carter Administration regarding the gasoline conservation fee does not appear to be publicly available, but another Department of Justice document cites a relevant portion and highlights why a Section 232 report is different from internal White House documents about

privilege properly protected candid legal advice and internal White House deliberations, it did *not* and could not protect the sort of record at issue—a secretarial report.

The bulk of the case law appears to limit the presidential-communications privilege to confidential records solicited and received by the President or his closest advisors for core Article II presidential decision-making. *See United States v. Nixon*, 418 U.S. 683, 715 (1974) (The privilege attends to the "unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article."); *In re Sealed Case*, 121 F.3d at 745, 752 (The privilege is rooted in "the President's unique constitutional role," particularly when "quintessential and nondelegable Presidential power" is at hand."). This is especially true in the FOIA context. "[T]he presidential communications privilege is rooted in the President's 'need for confidentiality in the communications of his office,' in order to effectively and faithfully carry out his Article II duties[.]" *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1115 (D.C. Cir. 2004). The privilege does not apply just because the "President[] [was] direct[ly] involve[d] in a communication, either as an author or recipient[.]" *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 28.

The limits of executive privilege—or, at least, the presidential-communications privilege—are particularly evident when dealing with records that reflect decisions required by law to be made by agency heads, as well as records about presidential decision-making authorized by a statutory delegation. As for the former, for example, it is indisputable that the President could not withhold agency reports created under the National Environmental Policy Act or the Regulatory Flexibility Act simply because they had passed through the White House at some point or were used for presidential deliberations. *See* 2d Tr. at 14:15–15:03. With each statute, Congress

---

how the President chooses to act on the Secretary's recommendations. *See* Letter from the Hon. Michael B. Mukasey, U.S. Att'y Gen., to the Hon. Harry Reid, U.S. S., at 3–4 (Nov. 14, 2008), *available at* http://bit.ly/2T2fVkk.

requires agencies to undertake investigations and publish reports.  *See* 42 U.S.C. § 4332; 40 C.F.R. pt. 1501; *see also* 5 U.S.C. §§ 603–04.  The Section 232 investigations and reports are no different.

As for the President's broader responsibility to oversee the Executive Branch, it is important to remember that constitutional provisions, such as the Take Care Clause, or vague notions of implied powers, are not independent sources of constitutional authority.  They merely impose obligations on the President to ensure the Executive Branch faithfully carries out the will of Congress.  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974).  Opposing counsel's suggestion that, once Congress delegates responsibility to the Executive Branch, "it's as if it's a power of the president," 2d Tr. at 36:18–19, with the same level of constitutional protection afforded to inherent Article II authority, finds no support in our system of constitutional governance and cannot support Commerce's use of the presidential-communications privilege.

### B.      The OLC Opinion confuses the interplay of the presidential-communications and deliberative-process privileges.

The OLC Opinion perpetuates Commerce's confusion over the interaction between the presidential-communications and deliberative-process privileges, which courts have historically treated as non-overlapping.  *See Judicial Watch, Inc.*, 365 F.3d at 1122; *see also Judicial Watch, Inc. v. Dep't of Justice*, No. 01-639, 2006 WL 2038513 (D.D.C. July 19, 2006).  "While the presidential communications privilege and the deliberative process privilege are closely affiliated, [they] . . . are distinct and have different scopes."  *In re Sealed Case*, 121 F.3d at 745.  The government has yet to point to a single case that supports the notion that the deliberative-process privilege can be used to withhold records that do not otherwise meet the higher bar for protection under the presidential-communications privilege.  *See* Pl.'s Reply at 13–15.

The relevant caselaw dealing with the deliberative-process privilege associates it with *agency* decision-making.  *See, e.g.*, *Senate of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987).  The D.C. Circuit requires the document be predecisional "of an *agency* policy" and "also be a part of the *agency* give-and-take[.]"  *Id.* (emphases added and citations omitted).  Even when courts have considered the possibility of both privileges applying to the same record exchanged between an agency and the White House, they have made pains to distinguish *whose* decision-making was implicated.  *See Loving v. Dep't of Def.*, 496 F. Supp. 2d 101, 108 (D.D.C. 2007).

Here, under Section 232, Congress assigned responsibility for the creation and publication of the Auto Tariffs Report to the Secretary of Commerce, and it foresaw no role for the President in that process.  *See* 19 U.S.C. § 1862(b); *cf.* Pl's Cross-Mot. at 17–18; 2d Tr. at 14:15–15:03.  Presidential decision-making begins only after the report is final and transmitted to the President, and that decision-making is not reflected in the report in any way.  *See* 19 U.S.C. § 1862(c).  Thus, a secretarial report cannot be privileged.

C.    **The OLC Opinion confuses the President's exercise of delegated tariff authority with his inherent responsibility for ongoing diplomatic negotiation and the conduct of foreign affairs.**

The OLC Opinion claims the Auto Tariffs Report "plainly implicates information in the field of foreign relations and national security."  OLC Opinion at 12.  That is a rather transparent sleight-of-hand, but an understandable one for OLC to attempt; executive privilege is at its strongest when records concern the exercise of core Article II power.  But the exercise of delegated tariff authority is *not* in the same category as the decision-making undertaken by the President as Commander in Chief or as the final authority in diplomatic matters.

CoA Institute explained before that the caselaw about treaty deliberations and diplomatic negotiations is inapt because it either implicates FOIA Exemption 1, which OLC has conceded is

not at issue, or because the Auto Tariffs Report does not reveal the "give-and-take" of the treaty process.  *See* Pl.'s Reply at 9–10.  Moreover, the OLC Opinion offers no limiting principle to distinguish the President's conduct of foreign affairs, or his efforts to protect national security, from other matters, including the performance of delegated statutory duties.

###   D.   The OLC Opinion is wrong about statutorily required reporting.

The OLC Opinion makes several claims about the limits on Congress's authority to require the Executive Branch to prepare and publish reports or to impose conditions upon the President's exercise of delegated authority.  The government argues that "[n]either the statutory origin of the [Auto Tariffs Report] [n]or its connection to the President's exercise of delegated authority means that executive privilege is inapplicable."  OLC Opinion at 14.  Despite the dearth of relevant caselaw about supposed "unconstitutional conditions" in appropriations legislation or ostensibly "unconstitutional" reporting regimes in statutes, two points are worth noting.

*First*, it is important to distinguish between reporting that is required as part of a statutory delegation, on the one hand, and reporting (or disclosure) *after the fact* as part of Congress's oversight or investigative function, on the other.  As noted, most of the examples the OLC Opinion relies on do not deal with the exercise of delegated authority as such, but involve congressional subpoenas to obtain organically created Executive Branch documents.  *See id.* at 17–19.  Under Section 232, by contrast, Congress directs the Secretary of Commerce to prepare and publish a report—this is a procedural condition that the agency must meet before the President exercises tariff authority.  *Cf. supra* at pp. 8–9.  Although the President may claim privilege over records reflecting how his Administration uses a secretarial report, the report *itself* reflects the agency's performance of a statutory duty in an area that otherwise belongs to Congress.  The government cannot keep it secret.  "Congress creates the executive departments and agencies [and] it may be empowered to legislate concerning legislative and public access to their internal affairs."

Archibald Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1419 (1974) (citing *Meyers v. United States*, 272 U.S. 52, 66–85 (1926) (Brandeis, J., dissenting)).

*Second*, the cases cited by the OLC Opinion where Congress tried to use appropriations legislation to force disclosure of records and deprive the President of the use of privilege are inapt because they involved Congress's attempt to use the "power of the purse" to usurp inherent presidential power.[4]  OLC Opinion at 20.  It is true, Congress cannot "supplant the Executive in what exclusively belongs to the Executive." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). But Section 232 concerns a constitutional authority belonging to Congress, and the secretarial report at issue is an integral part of Congress's delegation of that authority to the Executive Branch. The Auto Tariffs Report does not reflect presidential decision-making and does not implicate legitimate presidential confidentiality interests.  It cannot be kept secret under executive privilege.

## III.     Section 232 leaves little room for delay in publishing a secretarial report.

The OLC Opinion maintains that "[S]ection 232 requires [a] report's publication 'upon the disposition' of the Secretary's investigation."  OLC Opinion at 4.  CoA Institute pointed to this same term—"disposition"—in its reply brief.  Pl.'s Reply at 11.  The government argues that "disposition of an investigation" only occurs *after* the President takes final action under Section 232.  That must be wrong.  Statutory history, past and current practice, and common sense dictate that the "disposition" of a secretarial investigation occurs at the finalization of a secretarial report and upon transmission of that report to the President.

---

[4] *See, e.g.*, Office of Legal Counsel, Dep't of Justice, *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions* at 261 (July 31, 1989), *available at* http://bit.ly/2VyQVT4 ("Congress's authority incident to its power over the purse is broad, and generally includes the power to attach conditions to appropriations, but its power is by no means limitless.  For example, Congress appropriates money for all federal agencies in all three branches of government.  But the fact that Congress appropriates money for the Army does not mean that it can constitutionally condition an appropriation on allowing its armed services committees to have tactical control of the armed forces.").

A.      **Statutory History**

Section 232 requires that, "[u]pon the disposition of each request, application, or motion under subsection (b), the Secretary shall submit to the Congress, and publish in the Federal Register, a report on such disposition."  19 U.S.C. § 1862(d)′(1).  The phrase "request, application, or motion" appears in only one other provision of Section 232, which requires the Secretary to "immediately initiate an appropriate investigation" upon "request, application, or motion."  *Id.* § 1862(b)(1)(A).  Read together, subsections (b) and (d)′ demonstrate that the *Federal Register* publication requirement applies to the Secretary, not the President, and it attaches at the end of a secretarial investigation, not at the end of the overall Section 232 tariff process.[5]  To conclude otherwise would offend fundamental canons of statutory interpretation, which oblige courts to read the "language and design of [a] statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988), and to give "identical words used in different parts of the same act . . . the same meaning."  *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).

Section 1862(d)′ is the original publication provision from the Trade Expansion Act of 1962.  Pub. L. No. 87-794, § 232(d), 76 Stat. 872, 877; *cf.* OLC Opinion at 4 n.3.[6]  Congress added the current, more-detailed publication requirement found at 19 U.S.C. § 1862(b)(3)(B) with the Omnibus Trade and Competitiveness Act of 1988.  *See* Pub. L. No. 100-418, § 1501(a), 102 Stat. 1107, 1257–58.  The 1988 amendment also separated the Secretary's investigative and reporting responsibilities under subsection (b) from the President's responsibilities after submission of a report under subsection (c).  *See id.*  The statutory history therefore suggests that Congress understood the *Federal Register* publication requirement was tied to the conclusion of a secretarial

---

[5] Commerce's implementing regulations basically parrot the statutory language and provide no contradictory explanation.  *See* 15 C.F.R. §§ 705.10, 705.12; *cf. Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (discussing limited interpretative value of and judicial deference to parroting regulations).

[6] Section 1862(d)′ should have been renumbered as subsection (e) in the U.S. Code.  *See* 2d Tr. at 06:13–16.

investigation and not presidential action.   Otherwise, Congress would have added the new publication requirement in another part of Section 232.   To be sure, the retention of the partially superfluous original publication requirement may have been inartful, but "'[i]t is beyond [the] province [of the courts] to rescue Congress from its drafting error[.]'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) (citation omitted).   The Court should give effect to 19 U.S.C. § 1862(d)'.

### B.      Past and Current Practice

Past practice and the historical record support CoA Institute's argument.   On March 14, 1979, the Secretary of the Treasury transmitted a secretarial report to the White House and soon after published it in the *Federal Register*.[7]   *See* Publication of Report of Investigation to Determine the Effects on the National Security of Oil Imports, 44 Fed. Reg. 18,818 (Mar. 29, 1979).   In the notice, the Secretary explicitly indicated he was publishing a report "pursuant to section 232(d)"— the provision that refers to "disposition" of an "investigation." *Id.* Yet the President waited almost an *entire year* before acting on the report and imposing a gasoline conservation fee. *See* Petroleum Import Adjustment Program, 45 Fed. Reg. 22,864 (Apr. 3, 1980).   If the OLC Opinion were correct about the meaning of "disposition," then the secretarial report on oil imports would not have been released while presidential deliberations were ongoing.

When counsel for CoA Institute raised this example during the last oral hearing, the Court suggested that there is "nothing in the statute that prohibits the president . . . [or] secretary from publishing the report now," that is, on a discretionary basis while presidential decision-making is still ongoing.  2d Tr. at 09:19–10:11.  CoA Institute respectfully disagrees.  Assuming, *arguendo*, the government's understanding of Section 232 is correct, it would leave *no* room for discretion.

---

[7] The Secretary of the Treasury previously performed the function assigned today to the Secretary of Commerce. *See* OLC Opinion at 4 n.3.

14

The President's "written statement" under 19 U.S.C. § 1862(c)(2), which informs Congress of the action that will be undertaken, "*shall be* included in the report under subsection [(d)′],"[8] 19 U.S.C. § 1862(c)(2) (emphasis added), and that latter report "*shall*" be submitted to Congress and published in the *Federal Register* upon "disposition" of an investigation. *Id.* § 1862(d)′ (emphasis added). If "disposition" referred to the finalization of presidential decision-making, as the OLC Opinion maintains, then Section 232 would not permit the "early" release of a secretarial report. And even if it did, such discretionary publication would not obviate the requirement to publish a final report—whatever that may be—which includes both a copy of the secretarial report *and* the President's "written statement." Yet as far as CoA Institute can tell, no such report has ever been published. CoA Institute's explanation for the interaction of Section 232's different reporting provisions, and the meaning of "disposition," avoids these problems. *See infra* at pp. 15–17.

Relatedly, the Court asked if the "written statement" described at paragraph (c)(2), and discussed above, has any bearing on whether the subsection (d)′ report is the same report required to be published in the *Federal Register* under subsection (b). *See* 2d Tr. at 07:08–25, 08:05–13. There are several, related reasons why paragraph (c)(2) does not impact this case.

*First*, paragraph (c)(2) likely refers to a now-defunct reporting requirement that used to be listed under paragraph (d)′(2), immediately following the report referenced in paragraph (d)′(1) that must be published upon "disposition" of a secretarial investigation. *See* 2d Tr. at 08:14–09:04. The President previously "submit[ted] to the Congress an annual report on the operation" of Section 232. Omnibus Trade and Competitiveness Act of 1988, § 1501(b), 102 Stat. at 1259. That stand-alone report was eliminated with the Federal Reports Elimination and Sunset Act of 1995.

---

[8] Again, paragraph (c)(2) requires the President, within thirty days of determining whether to take action to adjust tariffs, to "submit to the Congress a written statement of the reasons" for his determination, which "shall be included in the report published under subsection [(d)′]." 19 U.S.C. § 1862(c)(2).

*See* Pub. L. No. 104-66, § 3003, 109 Stat. 707, 734–35.  It is reasonable to conclude that the annual report on the operation of delegated tariff authority would have been the one to include statements on presidential action under paragraph (c)(1).[9]

*Second*, to read paragraph (c)(2) in the manner suggested by the Court would undercut the further reporting requirements imposed by 19 U.S.C. § 1862(c)(3).  To wit: when the President decides *not* to take immediate action under subparagraph (c)(1)(B) but tries to renegotiate existing trade agreements—as was done here with automobile imports—he must inform Congress both of that initial decision, *see id.* at § 1862(c)(2), and also "publish in the Federal Register notice of any *additional* actions," including a decision to take no action at all.  19 U.S.C. § 1862(c)(3)(A) (emphasis added).  The existence of these latter reports makes little sense if the report required by paragraph (c)(2) were necessarily included in a secretarial report and if publication were delayed while "deliberations" remain ongoing, or so long as the President found continued secrecy useful.

*Third*, as for the practice of the current Administration, neither of Commerce's reports on the national security impacts of aluminum and steel imports included the "written statement" contemplated by paragraph (c)(2) and, in fact, both were dated and publicly released *before* the President acted.  *See* Dep't of Commerce, The Effect of Imports of Aluminum on the National Security (Jan. 17, 2018), *available at* http://bit.ly/2N35R9q; Dep't of Commerce, The Effects of Imports of Steel on the National Security (Jan. 11, 2018), *available at* http://bit.ly/2L7gBRJ.[10] Separate proclamations—ostensibly, the "written statements" required by paragraph (c)(2)—

---

[9] Commerce undertook at least four Section 232 investigations during the years that the paragraph (d)′(2) reporting requirement was effective.  *See* Pl.'s Cross-Mot. Ex. 3 at 6–7, ECF No. 24-3.  The relevant annual reports on presidential action do not appear to be publicly available and, because they would have been created by the White House for use by Congress, they would not likely be "agency records" subject to disclosure under the FOIA.

[10] CoA Institute cannot locate any evidence that Commerce published notices of availability for the steel and aluminum reports in the *Federal Register*, as required by Section 232 and its implementing regulations.  The agency simply posted them on its website.

followed the next month.  *See* Adjusting Imports of Steel into the United States, 83 Fed. Reg. 11,625 (Mar. 15, 2018); Adjusting Imports of Aluminum into the United States, 83 Fed. Reg. 11,619 (Mar. 15, 2018).  Thus, neither current practice nor the historical record confirms the Court's suggestion about the relevance of paragraph (c)(2).  *Cf. supra* at note 3.

### C.  Common Sense

Finally, as a matter of common sense, the OLC Opinion must be wrong about the meaning of "disposition" because, if taken to its logical conclusion, the OLC Opinion's reasoning would justify an absurd result: the President could indefinitely withhold a secretarial report, even after tariffs were imposed or if they were never imposed.

Here, the government argues the President has continuing authority under paragraph (c)(3) to act after attempted renegotiation of existing trade arrangements have failed.  *See* OLC Opinion at 11 (Section 232 "continues to authorize the President to take action [on auto imports]" but "[t]here . . . is no statutory deadline . . . to exercise that power" and there is "strong confidentiality interest" in keeping the secretarial report secret."); *cf. id.* at 6.  Elsewhere, the government has claimed the President enjoys special authority either to revisit or revise settled tariff decisions under paragraph (c)(1), *see, e.g.*, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States, 85 Fed. Reg. 5,281 (Jan. 29, 2020), or to delay "disposition" of a matter (and keep a secretarial report secret) even after the President *disagrees* with a secretarial recommendation and is arguably disallowed from undertaking *any* further action. *See* 2d Tr. at 10:01–04; *see also Cause of Action Inst. v. Dep't of Commerce*, No. 19-2698 (D.D.C. filed Sept. 9, 2019) (FOIA lawsuit for release of Section 232 Uranium Report); White House, Mem. On the Effect of Uranium Imports on the National Security & Establishment of the U.S. Nuclear Fuel Working Group (July 12, 2019), *available at* http://bit.ly/326VOmz.

The logic of the OLC Opinion, as applied to any of the above (non-hypothetical) situations, would permit the President to keep a Section 232 report secret for *any* reason, no matter what has or has not been done, and all under the guise of executive privilege and protecting the "national security" or ongoing "diplomacy."  *See* OLC Opinion at 12.  In other words, the publication requirement would be nullified.  That cannot be correct.  Even if Section 232 were ambiguous in setting a deadline for publication of a secretarial report—which it is not—the law does not give the President such unbridled discretion.  The natural reading of "disposition" is that it refers to the conclusion of a secretarial investigation, not presidential action.

## IV.   Commerce improperly withheld portions of the Auto Tariffs Report when it submitted *ex parte* a copy of the report for *in camera* review.

Finally, when Commerce noticed its *ex parte* submission of the Auto Tariffs Report to this Court, it explained that, "[c]onsistent with the Defense Production Act (50 U.S.C. § 4555(d))," it had "redact[ed] . . . proprietary information[.]"  Def.'s Not. of *Ex Parte* Submission at 1 n.1, ECF No. 34.  The agency provided no explanation or argument for the legitimacy of its withholding.  That potentially unprecedented act of refusing to disclose information to the Court for *in camera* review is an affront to the independence of the judicial system.  It also violates well-established constitutional principles about the ability of an Article III judge to review sensitive materials, including confidential business information, and standard FOIA litigation practice.

Commerce provided no argument for why the Defense Production Act ("DPA") even applies.  The DPA, which concerns the "domestic industrial base"—and not the national security threats posed by the importation of foreign commodities, *see generally* 50 U.S.C. § 4502—provides that the President may deem certain "information . . . confidential," and keep it from being "published or disclosed," unless he "determines that the withholding . . . is contrary to the interest of the national defense."  50 U.S.C. § 4555(d).  Yet such confidential "information" must

have been obtained *by the President* "as [was] necessary or appropriate" to enforce the DPA. Although the DPA provides for "industry studies assessing the abilities of the United States industrial base to support the national defense," *id.* § 4555(a), Commerce did not explain why such a report is identical to, or analogous enough to, a secretarial report under Section 232. Commerce also did not explain how preparing a secretarial report—a process purposefully set apart from presidential decision-making—otherwise implicates the DPA. And it did not point to any implementing regulations or official policies or procedures that confirm that the DPA is at all relevant in the administration of Section 232.

Even if the DPA did apply, it likely would not matter. Section 232 does not provide the President with broad discretion to withhold "confidential" information. It only permits Commerce to redact "proprietary information" or "classified information." 19 U.S.C. § 1862(b)(3)(B). Commerce has not explained how far the categories of "confidential" and "proprietary" information under the DPA and Section 232, respectively, overlap. And it failed to connect either statute to the FOIA: Commerce has not raised an Exemption 4 claim and Section 4555(d) is not a recognized Exemption 3 statute.

More importantly, even if Section 4555 applied to portions of the Auto Tariffs Report and otherwise gave the President discretion to withhold information independently of the FOIA or Section 232, that is insufficient grounds to withhold information *from an Article III judge*. The FOIA empowers this Court to conduct *in camera* review to "examine the contents of . . . agency records," 5 U.S.C. § 552(a)(4)(B), and to determine the legality of an agency's withholding, even when national security concerns are present. *See Armstrong v. Exec. Office of the President*, 97 F.3d 575, 577–78, 580 (D.C. Cir. 1996).[11] The matter is no different outside the FOIA context.

---

[11] Congress created the FOIA's *in camera* provision because it disagreed with the Supreme Court's view on the availability and utility of such review when dealing with classified documents under Exemption 1. *See Nat'l Labor*

*Cf. United States v. Reynolds*, 345 U.S. 1, 8–10 (1953).   Commerce's incomplete *ex parte* submission deprives the Court of the ability to determine the correctness of the Executive Branch's treatment of the Auto Tariffs Report.   That defeats the purpose of *in camera* review.   The Court should therefore order Commerce promptly to resubmit *ex parte* an *unredacted* copy of the report.

## CONCLUSION

For these reasons, and those set forth in CoA Institute's previous briefs and at oral argument, the Court should deny Commerce's motion for summary judgment and grant CoA Institute's cross-motion.   CoA Institute respectfully requests that the Court order Commerce to promptly produce the Auto Tariffs Report.

Dated: February 28, 2020                    Respectfully submitted,


/s/ Ryan P. Mulvey
Ryan P. Mulvey (D.C. Bar No. 1024362)
R. James Valvo, III (D.C. Bar No. 1017390)
Lee A. Steven (D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
james.valvo@causeofaction.org
lee.steven@causeofaction.org

*Counsel for Plaintiff*

---

*Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 235 (1978) (discussing Congress's reaction to *Envtl. Prot. Agency v. Mink*, 410 U.S. 73 (1983)).   *In camera* review has become an uncontroversial practice, even when dealing with highly sensitive records. *See* Office of Info. Policy, Dep't of Justice, *Litigation Review: History of Exemption 1 Disclosure Orders (FOIA Update, vol. XVI, No. 2)* (Jan. 1, 1995), http://bit.ly/2Td4QeN (last visited Feb. 28, 2020) (describing cases involving *in camera* review of classified information following FOIA reform post-*Mink*).