**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CAUSE OF ACTION INSTITUTE,

    *Plaintiff*,

  v.

U.S. DEPARTMENT OF COMMERCE,

    *Defendant*.

Civil Action No. 1:19-cv-00778 (CJN)

**MEMORANDUM OPINION**

In this suit under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, Plaintiff Cause of Action Institute seeks to compel the Department of Commerce to release a report prepared by the agency for the President regarding the national-security impact of the importation of passenger vehicles and automobile parts. *See generally* Compl., ECF No. 1. Although the Secretary of Commerce was required by Section 232 of the Trade Expansion Act of 1962 to prepare the report and make it public, Commerce contends that the report is covered by the presidential communications and the deliberative process components of executive privilege and therefore need not be produced under FOIA Exemption 5. *See generally* Defendant's Motion for Summary Judgment ("Def.'s Mot."), ECF No. 20. The Court agrees, and grants Commerce's Motion for Summary Judgment and denies Cause of Action's Cross-Motion.

## I.  Background

The United States Constitution gives Congress the authority to set tariffs and "regulate Commerce with foreign Nations." U.S. CONST. art. I, § 8, cl. 3. Section 232 of the Trade Expansion Act of 1962 ("Section 232"), delegates some of that authority to the President, allowing the President to modify imports to ensure that domestic industrial capacity remains sufficient to

safeguard the national security.  19 U.S.C. § 1862.  The President's statutory authority is broad. He is permitted to take actions—including modifying tariffs—that in his estimation "must be taken to adjust" imports "so that such imports will not threaten to impair the national security."  *Id.* § 1862(c)(1)(A)(ii).

But Congress's delegation is not unconditional.  Before the President can exercise his Section 232 authority, the Secretary of Commerce must, on request or on his motion, initiate "an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request."  *Id.* § 1862(b)(1)(A).  After concluding the investigation, the Secretary must submit to the President a report detailing the factual findings and recommendations on how to neutralize a threat to national security, if one exists.  *Id.* § 1862(b)(3)(A).  If the Secretary's report finds that "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President must determine whether he agrees with that finding and, if so, "determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article[s]" such that they "will not threaten to impair the national security."  *Id.* § 1862(c)(1)(A).

Section 232 also requires publication of the Secretary's report.  The statute states that "[a]ny portion of the report submitted by the Secretary . . . which does not contain classified information or proprietary information shall be published in the Federal Register."  *Id.* § 1862(b)(3)(B).  Section 232 does not, however, include an express deadline by which the report must be published.

In May 2018, the President "instructed" the Secretary "to consider initiating a Section 232 investigation into imports of automobiles, including trucks, and automotive parts to determine their effects on America's national security," Statement from the President on Potential National

Security Investigation into Automobile Imports, ECF No. 20-3, Exhibit 6, which the Secretary did later that month.  *See* Def.'s Mot., ECF No. 20, at 2; *see also* Notice of Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Automobiles, Including Cars, SUVs, Vans and Light Trucks, and Automotive Parts, 83 Fed. Reg. 24,735 (May 30, 2018).  After concluding his investigation, the Secretary transmitted a report (hereafter, the "Report") to the President containing his factual findings and proposed recommendations.  In particular, the Secretary found that "present quantities and circumstances of automobile and certain automobile parts imports threaten to impair the national security," and recommended that the President take certain actions to correct the issue.  Proclamation No. 988, 84 Fed. Reg. 23,433, 23,434 (May 21, 2019).

Three months later, the President issued a proclamation concurring with the Secretary's determination that the United States is currently importing automobiles and certain automobile parts at such a rate and under such circumstances that it threatens to impair the national security. *See* 84 Fed. Reg. 23,433.  The proclamation itself summarizes the Report's conclusions, including the Secretary's proposed recommendations, and directly quotes the Report five times.  *See id.* Most of the quotes are only sentence fragments, but the proclamation does include one quotation that is a full sentence long.  *See id.*

Although the President agreed with the Secretary's findings, he did not invoke his statutory authority to impose tariffs on the imports of automobiles or their parts.  Instead, based on the Secretary's determination that successful trade negotiations could remedy the threatened impairment to national security, the presidential proclamation directed the U.S. Trade Representative to engage in negotiations with Japan, the European Union, and others to address

the threat.  *Id.* at 23,434.  Those negotiations remain ongoing and have not yet produced an agreement.

In February 2019, Cause of Action sent two FOIA requests to Commerce—one to the Bureau of Industry and Science, which prepared the Report, and one to the Office of the Secretary, which was responsible for transmitting the Report to the President—seeking the Report.  A month later, Cause of Action filed this lawsuit, alleging that Commerce failed to provide a timely determination on or produce records responsive to the FOIA requests.  *See* Compl. ¶¶ 14–21, ECF No. 1.  Shortly thereafter, Commerce informed Cause of Action that it would be withholding the Report in its entirety under Exemption 5 of FOIA, claiming the document was protected from disclosure by both the presidential communications privilege and the deliberative process privilege.  The Parties ultimately filed cross-motions for summary judgment, and the Court held a hearing on the motions.  *See generally* Def.'s Mot., ECF No. 20; *see also generally* Pl.'s Opp'n, ECF No. 23.

Subsequent to the Parties' briefing on their cross-motions, Congress passed and the President signed into law the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317 (2019).  Section 112 of the 2020 Appropriations Act expressly directs the Secretary to publish the Report within thirty days of the enactment of the Act, that is, by January 19, 2020.  Consolidated Appropriations Act, 2020, § 112, 133 Stat. at 2395.

However, when the President signed the Act into law, he stated that certain provisions "purport to mandate or regulate the dissemination of information that may be protected by executive privilege."  Presidential Statement on Signing the Consolidated Appropriations Act, 2020, 2019 Daily Comp. Pres. Doc. No. DCPD201900881, at 2 (Dec. 20, 2019).  The President also stated that his administration would "treat these provisions consistent with the President's

constitutional authority to control information, the disclosure of which could impair the national security, foreign relations, the deliberative process of the executive branch, or the performance of the President's constitutional duties." *Id.*

On January 17, 2020, two days before the new congressionally imposed deadline for release, the Department of Justice's Office of Legal Counsel issued an opinion concluding that the Secretary need not comply with the deadline because the statute did not overcome the executive privileges that apply to the Report. *See generally* Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security (Slip Opinion), ECF No. 31. Specifically, the OLC Opinion found that the Report fell within the presidential communications component and the deliberative process component of executive privilege, *id.* at 7, and further concluded that Congress could not override the privilege here. *Id.* at 23.

The Court held an additional hearing on the motions and permitted the Parties to submit supplemental briefs on the effect of the Appropriations Act and the OLC opinion. The Court also required Commerce to submit the Report for *in camera* review. Commerce complied, first submitting the Report in redacted form, *see* Def.'s Notice of Ex Parte Submission for In Camera Review, ECF No. 34, and later without redactions, *see* Def.'s Notice of Ex Parte Submission for In Camera Review, ECF No. 45. To date, the government has not released the Report, either to the public or Cause of Action.

## II.     Legal Standard

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). "FOIA . . . mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011). "FOIA mandates a 'strong presumption in favor of disclosure,'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting

*U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991))—so much so that FOIA "expressly places the burden 'on the agency to sustain its action' and directs the district courts 'to determine the matter *de novo*,'" *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  FOIA permits the Court to review the records *in camera* "to determine whether such records or any part thereof shall be withheld under any of the exemptions." 5 U.S.C. § 552(a)(4)(B).

FOIA requires federal agencies to release all records responsive to a request for production unless a specific exemption is applicable.  5 U.S.C. § 552(a)(3)(A), (a)(4)(B), (b).  "[D]isclosure, not secrecy, is the dominant objective of the Act."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).  Even with this chief objective, Congress recognized that the release of certain information "may harm legitimate governmental or private interests."  *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).  The statute therefore allows agencies to withhold those documents that fall under one of nine specific exemptions.  *Pub. Citizen, Inc. v Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).  These exceptions are to be interpreted "narrowly."  *Nat'l Ass'n of Home Builders*, 309 F.3d at 32.

When an agency makes a withholding based on a FOIA exemption, the agency must explain the exemptions claimed and the applicability of those exemptions.  *Reporters Comm. for Freedom of the Press*, 489 U.S. at 753.  "The Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).

### III.    Analysis

### A.    Exemption 5

Commerce has asserted FOIA Exemption 5 to justify its withholding of the Report. Exemption 5 allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Two conditions must be met for a record to qualify for this exemption:  (1) "its source must be a Government agency;" and (2) "it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  As relevant here, Exemption 5 encompasses privileges including the presidential communications and deliberative process privilege. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004).

The presidential communications privilege is a "presumptive privilege for Presidential communications."  *United States v. Nixon*, 418 U.S. 683, 708 (1974).  "[T]he privilege itself is rooted in the need for confidentiality to ensure that presidential decisionmaking is of the highest caliber, informed by honest advice and full knowledge."  *In re Sealed Case*, 121 F.3d 729, 750 (D.C. Cir. 1997).  The privilege is "fundamental to the operation" of the federal government as it permits the "effective discharge of a President's powers." *Judicial Watch, Inc. v. Dep't of Justice*, 913 F.3d 1106, 1110 (D.C. Cir. 2019) (quoting *Nixon*, 418 U.S. at 711).

The presidential communications privilege protects "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential."  *In re Sealed Case*, 121 F.3d at 744.  It therefore protects "communications directly

7

involving and documents actually viewed by the President" when the president is engaged in making presidential decisions. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1114. But it also stretches beyond communications "made directly to the President to include all communications solicited and received by the President's 'immediate White House advisers' or even certain members of their staff." *Judicial Watch, Inc. v. Dep't of Justice*, 913 F.3d at 1111 (quoting *In re Sealed Case*, 121 F.3d at 752). Because the President's advisers must receive information and recommendations from a variety of sources, the privilege gives these advisers the "elbow room" they need to advise the President effectively. *In re Sealed Case*, 121 F.3d at 752.

The presidential communications privilege is broad—covering both pre-decisional and post-decisional materials and protecting those materials in their entirety. *Elec. Privacy Info. Ctr. ("EPIC") v. Dep't of Justice*, 320 F. Supp. 3d 110, 115 (D.D.C. 2018) (citing *In re Sealed Case*, 121 F.3d at 745). In the FOIA context, it is well settled in this District that an agency maintains the authority to apply the presidential communications privilege. *See, e.g.*, *EPIC*, 320 F. Supp. 3d at 117 ("[T]he Court is persuaded by earlier decisions from this District that an agency has the authority to invoke the presidential communications privilege when making FOIA Exemption 5 withholdings.").

The deliberative process privilege, though "closely affiliated" with the presidential communications privilege, has a distinct scope. *In re Sealed Case*, 121 F.3d at 745. This privilege allows for documents created during the government's decision-making process to be protected from disclosure. *See id.* The deliberative process privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front-page news." *Klamath Water Users Protective Ass'n.*, 532 U.S. at 8–9. The "ultimate purpose" of the privilege is to "prevent injury to the quality of agency decisions." *Nat'l*

*Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–51 (1975).  To qualify for protection under the deliberative process privilege, the agency must show that the information is both (1) "predecisonal" and (2) "deliberative."  *Nat'l Ass'n of Home Builders*, 309 F.3d at 39.

### 1.   Inter- or Intra-Agency Memorandum

In a threshold attack, Cause of Action argues that Exemption 5 is inapplicable here because the Report is not an "inter-agency or intra-agency memorandum[] or letter[]."  5 U.S.C. § 552(b)(5); *see* Pl.'s Opp'n, ECF No. 23, at 7–8.  The main thrust of this argument is that the recipients of the Report—the President and his immediate White House staff—are not agencies under FOIA.  *See* Pl.'s Opp'n, ECF No. 23, at 8–9.  To be sure, FOIA defines "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."  5 U.S.C. § 552(f)(1). The President himself and his close advisors are not captured within this definition.  Because the Report was transmitted to the President, Cause of Action argues, it cannot be considered an "inter-agency or intra-agency memorandum[] or letter[]."  *See* Pl.' Opp'n, ECF No. 23, at 8–9.

Whatever the initial textual force of this argument, the D.C. Circuit has held "that, in at least some circumstances, a record need not necessarily be addressed both to and from employees of a single agency to qualify as 'intra-agency' and need not necessarily be exchanged among two entities defined as agencies under FOIA to qualify as 'inter-agency.'"  *Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d 97, 106 (D.D.C. 2018).  Instead of adopting the narrow construction of Exemption 5 that Cause of Action urges here, the D.C. Circuit (along with several other circuits) has adopted a functional approach to interpreting the statute's inter- and intra-agency requirement. *See Nat'l Inst. Of Military Justice v. Dep't of Def.*, 512 F.3d 677, 679–86 (D.C. Cir. 2008) (detailing the D.C. Circuit's early adoption of the functional approach and affirming its continued

validity).  In *Judicial Watch, Inc. v. Department of Energy,* 412 F.3d 125 (D.C. Cir. 2005), the D.C. Circuit held that the deliberations of a presidential advisory group could be protected from disclosure under Exemption 5, even though the group, whose "sole function [was] to advise and assist the President," was not an "agency" subject to FOIA.  *Id.* at 129.  Reaffirming its functionalist approach to the intra- and inter-agency requirement, the Court found it "inconceivable" that "Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is made by 'agency' officials subject to oversight by the President and not when the decision is to be made by the President himself and those same agency officials acting in aid of his decision-making processes." *Id.* at 130.  As other courts in this district have noted, *Judicial Watch, Inc. v. Department of Energy* and other decisions stand "for the proposition that 'the threshold requirement is satisfied for communications exchanged between agencies and the Office of the President, even though that office is not an agency for the purposes of FOIA.'" *Judicial Watch, Inc. v. Dep't of State*, 306 F. Supp. 3d at 109 (quoting *Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d. 1, 10 (D.D.C. 2014)).

Following this precedent, courts in this District have concluded that documents exchanged between an Executive Branch agency and the President and his close advisors qualify as inter-agency or intra-agency memorandums or letters.  *See, e.g., Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d. at 11 (communications between CFPB, an agency under FOIA, and White House staff could be considered inter-agency or intra-agency memorandums for the purposes of Exemption 5).  The Court will do the same here, and holds that the Automotive Report meets the threshold requirement of being an inter-agency or intra-agency memorandum or letter under Exemption 5 of the FOIA.

2.      **Presidential Communications Privilege**

That does not end the matter, of course; Commerce must also establish that the Report is subject to an Exemption 5 privilege.

As most relevant here, the presidential communications privilege protects documents "solicited and received" by the President or "communications made in the process of arriving at presidential decisions." *In re Sealed Case*, 121 F.3d at 745. The Report is a confidential memorandum from the Secretary to the President, containing the Secretary's advice on decisions delegated to the President by statute. The Report was prepared for the President after he requested the Secretary to consider initiating a Section 232 investigation into automobiles and automobile imports. *See* Statement from the President on Potential National Security Investigation into Automobile Imports, ECF No. 20-3, Exhibit 6. The President relied on the Report in deciding that the current rate of importation and circumstances surrounding the importation of automobiles and automobile parts posed a threat to the national security, and in directing the U.S. Trade Representative to negotiate agreements with the European Union, Japan, and other nations was the appropriate response to the threat. The President has an interest in keeping the Report non-public until the U.S. Trade Representative has finished conducting negotiations and the President has made a final decision on how to remedy the potential national security threat.

a.      *Pre-Enactment of the 2020 Appropriations Act*

Prior to the passage of Section 112 of the 2020 Appropriations Act, Cause of Action raised three arguments why the Report should not be shielded by the presidential communications privilege, even without a congressionally mandated deadline for release. Pl.'s Opp'n, ECF No. 23, at 14. Cause of Action first suggested that the Report is not protected by the presidential communications privilege because the communication was not "made in support of the President exercising an inherent Article II power," Pl.'s Opp'n, ECF No. 23, at 14, but was instead used in

aid of the President's decision-making process regarding a delegated authority. *Id.* Cause of Action argues that the Supreme Court has noted that the presidential communications privilege is grounded in Article II, *see Nixon*, 418 U.S. at 705 ("Whatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art[icle] II powers, the privilege . . . derive[s] from the supremacy of each branch within its own assigned area of constitutional duties."); *N.Y. Times Co. v. Jascalevich*, 439 U.S. 1317, 1323 (1978) (the "privilege protect[s] Presidential communications in the exercise of Art[icle] II powers"), and cites decisions in which the D.C. Circuit and courts in this district have considered whether a power is a core Article II power when assessing whether the presidential communications privilege applies. *See, e.g., In re Sealed Case*, 121 F.3d at 752–53 (holding the privilege applied where "the documents in question were generated in the course of advising the President in the exercise of his appointment and removal power, a quintessential and nondelegable Presidential power"); *see also Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 25 (D.D.C. 2013) (finding the privilege inapplicable and noting "this is not a case involving 'quintessential and nondelegable Presidential power' . . . where separation of powers concerns are at their highest").

This argument misapprehends the scope of the presidential communications privilege. The D.C. Circuit has consistently cautioned that limiting the protection of the presidential communications privilege to only "quintessential and nondelegable Presidential power . . . draws an arbitrary line." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1123. Courts in this district have therefore consistently refused to narrow the scope of the privilege to only communications relating to the President's exercise of core Article II powers. *See United States v. Philip Morris USA, Inc.*, Civ. Action No. 99-2496, 2004 WL 3253662, at *1–2 (D.D.C. Sept. 9, 2004) ("[L]imiting the privilege to only those communications regarding non-delegable powers would

undermine the very purposes for which it exists.").  Other courts have similarly refused to cabin the privilege to the President's core Article II powers.  *See, e.g.*, *Advocates for the W. v. Dep't of Justice*, 331 F. Supp. 3d 1150, 1163–65 (D. Idaho 2018) (concluding that "the presidential communications privilege is not limited only to quintessential Article II powers" and noting that courts have applied the privilege "to a multitude of communications, documents, and circumstances").  And various courts, including in this district, have recognized the privilege even where the President is not exercising core Article II duties.  *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Security*, No. 06-cv-0173 (RJL), 2008 WL 2872183, at *2–3 (D.D.C. July 22, 2008); *Ctr. for Biological Diversity v. Office of Mgmt. & Budget*, No. 07-cv-4997, 2009 WL 2940204, at *6 (N.D. Cal. Aug. 25 2009), *as amended* (Sept 9, 2009); *Berman v. CIA*, 378 F. Supp. 2d 1209, 1218–22 (E.D. Cal. 2005); *N.Y. Times Co. v. Dep't of Def.*, 499 F. Supp. 2d 501, 516 (S.D.N.Y. 2007).  Cause of Action's argument is unpersuasive.

Second, Cause of Action asserts that Commerce cannot rely on the presidential communications privilege because the President lacks any confidentiality interest in the Report.  *See* Pl.'s Opp'n, ECF No. 23, at 20.  The presidential communication privilege is "construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected."  *In re Sealed Case*, 121 F.3d at 752.  Cause of Action asserts that because the Report must be published at some time, the President cannot have any interest in keeping it confidential.  *See* Pl.'s Opp'n, ECF No. 23, at 20.  Because all parties knew that disclosure of the Report was required, Cause of Action argues, neither the Secretary nor any other Commerce official drafting the Automotive Report should have reasonably believed that their recommendations and advice to the President would not be made public.

This argument, however, ignores the President's strong short-term interest in keeping the Report confidential while the U.S. Trade Representative continues negotiations and the President continues to consider other options to deal with the national security threat.  Courts in this district have previously recognized a strong confidentiality interest in documents relating to treaty negotiations containing information that, if made public, might weaken the United States' negotiating position.  *See, e.g.*, *Fulbright & Jaworski v. Dep't of Treasury*, 545 F. Supp. 615, 619–20 (D.D.C. 1982) (holding notes of an agency employee reflecting positions taken and issues raised in treaty negotiations properly withheld under Exemption 5 because their release would harm the agency's negotiation process); *see also Brayton*, 657 F. Supp. 2d at 145 (concluding that the U.S. Trade Representative was entitled to withhold a document revealing its own sensitive negotiation position).  So too here.  As Commerce puts it, any "premature release of [the report] would harm the President's Section 232 decision-making process by revealing information pertinent to the [U.S. Trade Representative's] ongoing negotiations and compromise any such further action that the President may deem necessary."  *See* Def.'s Mot., ECF No. 23, at 13; *see* Lieberman Decl. ¶ 39 ("To publish the . . . Report while negotiations remain ongoing . . . could compromise or undermine the government's efforts.").

Furthermore, although Cause of Action contends that Congress struck a balance between the public's need for access to the reports and the government's need for nondisclosure, its argument fails to account adequately for the fact that Section 232 does not require disclosure by a particular deadline.  In fact, the statute contains numerous *other* deadlines, indicating that Congress knew well how to set a timetable for disclosure of Section 232 reports if it wished to impose one.  For example, the Secretary must submit a report to the President within 270 days after an investigation is initiated, 19 U.S.C. § 1862(b)(3)(A); the President must agree or disagree with the

Secretary's findings within 90 days of receiving the report, *id.* § 1862(c)(1)(A); and if the President chooses to adjust imports, he must do so within 15 days of his concurrence with the Secretary's findings, *id* § 1862(c)(1)(B), and must inform Congress of that decision within 30 days, *id* § 1862(c)(2).  When the Report here was drafted, no similar deadline applied to its publication, and Plaintiff essentially urges this Court to impose a deadline on disclosure where Congress originally did not.[1]

     Based on the harms that could result from releasing the report during trade negotiations, the absence of a deadline for disclosure of the Secretary's report in Section 232, and past practice in delaying the release of a Section 232 report until after trade negotiations have concluded, the Court concludes that the Executive Branch has a legitimate and significant confidentiality interest

---

[1] Recognizing that a Section 232 report can remain confidential until the President has determined how to address a reported national security threat and until that course of action has been fully effectuated appears to be consistent with past practice.  In 1959, pursuant to section 232's statutory predecessor, the Trade Agreements Extension Act of 1955, Pub. L. No. 84-86, § 7, 69 Stat. 162, 166, which charged the Director of the Office of Defense Mobilization with the investigation of imports that pose a threat to the national security, the Director advised President Eisenhower on the effects of crude oil imports.  President Eisenhower took action in March 1959, imposing import restrictions on crude oil.  Proclamation No. 3279, 24 Fed. Reg. 1781 (Mar. 12, 1959).  But the Director did not submit his statutory report to Congress until four months later.  In 1975, the Secretary of the Treasury advised President Ford through a Section 232 report that imports of crude oil posed a threat to the national security.  *See* Effects of Imported Articles on the National Security, 40 Fed. Reg. 4457, 4457 (Jan. 30, 1975).  The Secretary did not publish that report in the Federal Register until after the President issued a presidential proclamation adjusting fees on imports.  Proclamation No. 4341, 40 Fed. Reg. 3965 (Jan. 27, 1975).  Furthermore, in recent practice the Secretary has often waited for months after the President's decision to disclose the report.  *See, e.g.*, Summary of Secretarial Report Under Section 232 of the Trade Expansion Act of 1962, as Amended, on the Effect of Imports of Crude Oil on the National Security, 65 Fed. Reg. 46,427, 46,427 (July 28, 2000) (President decided to take no action on March 24, 2000); Summary of Secretarial Report Under Section 232 of the Trade Expansion Act of 1962, as Amended, 60 Fed. Reg. 30,514, 30,515 (June 9, 1995) (President decided to take no action on February 16, 1995).  At a minimum, past practice suggests that the President has an interest in keeping a section 232 report confidential until final action is taken with respect to its subject matter.

in delaying the publication of the Report until the President has addressed the national security concerns raised in it.

Finally, Cause of Action argues that the Commerce Report cannot be a presidential communication because it was not a document solicited and received by the President under the statutory process outlined in Section 232.  *See* Pl.'s Reply, ECF No. 27, at 12.  Commerce disagrees, contending that the "Report was indisputably 'solicited and received' by the White House pursuant to Section 232."  Def.'s Reply, ECF No. 25, at 13.

Section 232 specifies that a report is to be created after an investigation has been initiated "[u]pon request of the head of any department or agency, upon application of an interested party, or upon [the Secretary of Commerce's] own motion."  19 U.S.C. § 1862(b)(1)(A).  As Cause of Action points out, the President is not an agency or department head, and he cannot be an "interested party," as that term is defined in the Trade Expansion Act.  *See id.* § 1677(9).  The President could not have formally requested the Report under the statute, Cause of Action argues, and thus the President has not "solicited and received" the Report.

This argument, too, is misguided.  Whether the Report is subject to the presidential communications privilege does not (and cannot) hinge on whether the President solicited the Report in the express manner provided by the Act.  Cause of Action has cited no authority standing for the proposition that the President must make a formal request in order for a Section 232 report to qualify for the presidential communications privilege.  In any event, here the President "instructed" the "Secretary to consider initiating a Section 232 investigation" into the importation of automobiles and automobile parts.  *See* Statement from the President on Potential National Security Investigation into Automobile Imports, ECF No. 20-3, Exhibit 6.  *Cf. Formaldehyde*

*Institute v. Dep't of Health and Human Servs.*, 889 F.2d 1118, 1124 (D.C. Cir. 1989) (interpreting "solicited and received" broadly in the context of the deliberative process protection).

More important, the Report memorializes Commerce's analysis and recommendations that have been used, and may be used in the future, to inform the President's decision-making on how to address a potential national security threat.  Because it was a communication "directly involving . . . the President," *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1114, was "made in the process of arriving at [a] presidential decision[]," *In re Sealed Case*, 121 F.3d at 745, and was "essential to the conduct of the office of the President," *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977), the Report is covered by the presidential communications privilege regardless of whether the President formally triggered the Section 232 investigation under 19 U.S.C. § 1862(b)(1)(A).

The Court therefore concludes that the presidential communications privilege applied to the Report prior to the enactment of the 2020 Appropriations Act.

### b.    *Post-Enactment of the 2020 Appropriations Act*

The remaining question is whether Congress's subsequent action in the 2020 Appropriations Act—which provided a date certain (January 19, 2020) for public disclosure of the Report—affects the analysis and makes Exemption 5 inapplicable here.  The Court concludes that it does not.

When the Report was prepared, Section 232 did not require that it be published by a particular date.  The Secretary was therefore able to provide his findings and recommendations to the President knowing that the Report would not become public before its advice and recommendations were acted upon.  *See Dellums*, 561 F.2d at 246 (reaffirming that the presidential communications privilege is "premised on the needs of present and future Presidents to maintain the confidentiality of communications with their advisors in order to encourage the candid advice

necessary for effective decisionmaking").  That is particularly important where, as here, the Secretary's recommendations included pursuing trade agreement negotiations to remedy an assessed national security threat, and where disclosure of the Report could reveal the United States' sensitive negotiating position, potentially undermining the President's ability to mollify the identified national security threat.  *See Fulbright*, 545 F. Supp. at 619–20 (holding notes of an agency employee reflecting positions taken and issues raised in treaty negotiations properly withheld under Exemption 5 because their release would harm the agency's negotiation process).  Those concerns and interests still exist, regardless of the 2020 Appropriations Act.[2]

Cause of Action contends that the Report is the product of Commerce's performance of a statutory duty in an area that otherwise belongs to Congress, and thus the agency cannot keep the document secret when Congress requires its immediate publication.  *See* Pl.'s Supp. Br., ECF No. 36, at 4.  Cause of Action notes, and Commerce does not dispute, that Congress can attach preconditions to grants of authority to the Executive Branch, including requiring the publication of documents created by an agency.  *See* Pl.'s Supp. Br., ECF No. 36, at 11; *see also* Amici Curiae Br., ECF No. 37, at 6–7.  Cause of Action argues that in this case Congress attached a condition (publication of the Report by a particular date) to the executive branch's exercise of a delegated duty (the investigation of imports and any future actions regarding them).  But Section 112's

---

[2] Indeed, permitting Congress to override the presidential communications privilege by accelerating the required date of publication after a report has already been created would have a chilling effect on the Secretary's ability to provide candid advice and recommendations in the future.  If Cause of Action's position here were correct, at any moment after the Secretary creates a Section 232 report Congress could require its immediate publication.  The Secretary may have to moderate the contents of his report to ensure that he does not disclose information that, if publicized because of a later statutory enactment, could harm ongoing trade negotiations by revealing negotiation strategy and key objectives.  The underlying purpose of the presidential communications privilege—to ensure that the President receives candid and frank advice— would be harmed if the Court found that disclosure was required.

deadline-for-publication requirement does not represent a precondition imposed upon a future decision within the Executive Branch's discretion.  Here, the Executive Branch could not avoid the immediate publication condition (if it deemed the condition too arduous) by not initiating a Section 232 investigation.  Instead, Section 112 is mandatory, and in any event, it is backward looking, requiring the publication by a specific date of a report that the Executive Branch had already created before that deadline existed.  Congress cannot override the presidential communications privilege in the FOIA context by imposing a mandatory, retroactive condition on a grant of authority that the Executive Branch has already executed.  *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981) (Congress cannot "supris[e] participating States with post-acceptance or 'retroactive' conditions" on federal funding).

The Court holds that the presidential communications privilege applies to the Report, and that Section 112's later-imposed requirement that the Report be made public by a specific deadline does not diminish the privilege in the context of FOIA.[3]

### B.      Waiver

Cause of Action argues that even if the presidential communications privilege (or deliberative process privilege) could apply to the Report, Commerce waived its right to claim an exemption when the President publicized aspects of the Report by directly quoting from and summarizing portions of it in the presidential proclamation.  *See* Pl.'s Opp'n, ECF No. 23, at 20–23.  In the interest of resolving the dispute, Commerce has agreed to treat the presidential proclamation's direct quotes of the Report as waived, and to release those portions of the Report to Plaintiff.  Def.'s Supp. Br., ECF No. 44, at 12.  Commerce argues, however, that the remainder

---

[3] Because the presidential communications privilege applies to the Report, the Court need not consider Commerce's second argument that the deliberative process privilege applies.

of the Report is still subject to the presidential communications privilege.  *See* Def.'s Supp. Br.,
ECF No. 44, at 11–12.

An agency may waive its right to claim a FOIA exemption over information already in the
public domain.  *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013).  But the mere fact that similar
information is already available to the public does "not necessarily mean that official disclosure
will not cause harm" that the FOIA exemptions seek to prevent.  *Wolf v. CIA*, 473 F.3d 370, 378
(D.C. Cir. 2007).  A FOIA plaintiff must therefore do more than point to the fact that *similar*
information has been made public.  Rather, the plaintiff bears the burden of showing that "specific
information in the public domain . . . appears to duplicate that being withheld."  *Afshar v. Dep't of
State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

Three stringent requirements must be satisfied to demonstrate waiver.  First, the record
sought "must be as specific as the information previously released."  *Fitzgibbon v CIA*, 911 F.2d
755, 765 (D.C. Cir. 1990).  Second, it "must match the information previously disclosed."  *Id.*  And
finally, "the information requested must already have been made public through an official and
documented disclosure."  *Id.*  Previously generalized disclosures do not result in waiver, if they do
"not precisely track the records sought to be released."  *Assassination Archives & Research Ctr.
v. CIA*, 334 F.3d 55, 60 (D.C. Cir. 2003); *see also Judicial Watch, Inc. v. Nat'l Archives & Records
Admin.*, 214 F. Supp. 3d 43, 57 (D.D.C. 2016) (rejecting waiver arguments relying on "paraphrased
and quoted grand jury testimony," and concluding that "plaintiff has not point to specific items of
information in the public domain that sufficiently demonstrate that the information contained in
the drafts of the proposed indictment are publicly available to warrant disclosure"), *aff'd on other
grounds*, 876 F.3d 346 (D.C. Cir. 2017).

The government waived the presidential communications privilege as to those portions of the Report that are directly quoted in the President's Proclamation. But as to the remainder of the Report, Cause of Action cannot meet the second prong of the *Fitzgibbon* test. The Court has reviewed the Report *in camera*, and the presidential proclamation's brief summary of the findings and recommendations in the Report were not made in terms that match exactly the unredacted information contained in the Report.

## C.     Segregability

Having found that Exemption 5 properly applies to the Report and that the presidential proclamation did not waive executive privilege as to the entire Report, the Court turns to Cause of Action's final argument—that Commerce failed to disclose all reasonably segregable content. *See* Pl.'s Opp'n, ECF No. 23, at 32–35.

When an agency withholds a requested record based on an enumerated FOIA exemption, the agency must still disclose "[a]ny reasonably segregable," non-exempt portions of the requested record. 5 U.S.C. § 552(b). This requirement applies to all records and all FOIA exceptions. *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984). And courts are required to expressly find that the agency produced all reasonably segregable portions of the record. *Morley v. C.I.A.*, 508 F.3d 1108, 1123 (D.C. Cir. 2007). District courts cannot "simply approve the withholding of an entire document without entering a finding on segregability." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (quoting *Powell v. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991)). .

In making such a finding, courts recognize that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshalls Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To establish that all reasonably segregable, non-exempt information has been disclosed, the agency need only show with

"reasonable specificity" that the information withheld cannot be further segregated.  *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 580 (D.C. Cir. 1996).  An agency satisfies this standard if it can demonstrate that disclosure of the non-exempt portion of the document would result in the release of "only incomplete, fragmented, unintelligible sentences composed of isolated meaningless words."  *Brown v. Dep't of Justice*, 734 F. Supp. 2d 99, 111 (D.D.C. 2010) (quoting *Nat'l Sec. Archive v. CIA*, 402 F. Supp. 2d 211, 220–21 (D.D.C. 2005)).  Once the agency has put forward a declaration to this effect, the agency is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material."  *Sussman*, 494 F.3d at 1117.  The burden shifts to the plaintiff "to produce a 'quantum of evidence' to rebut the presumption, at which point 'the burden lies with the government to demonstrate that no segregable, nonexempt portions were withheld.'"  *Am. Ctr. for Law & Justice v. Dep't of State*, 330 F. Supp. 3d 293, 306 (D.D.C. 2018) (quoting *Sussman*, 494 F.3d at 1117).

Here, Commerce has met its initial burden.  Through the Lieberman Declaration, Commerce has demonstrated "with reasonable specificity" that the information withheld could not be further segregated.  *See generally* Lieberman Declaration ("Lieberman Decl."), ECF No. 20-3, Exhibit A.  Commerce's "careful review of the Automotive Report" revealed that the nonexempt information in the Report could not be successfully untangled from the protected information.  Lieberman Decl. ¶ 43.  Any disclosure of exempt information would have resulted in the disclosure of "a meaningless set of words or phrases which have no or minimal information content."  *Id.* Because Commerce met its burden and is thus entitled to a presumption that it complied with its obligation to disclose reasonably segregable material, the burden shifted to Cause of Action, which has not rebutted this presumption.  The Court concludes that the segregability requirement is satisfied with respect to the Report.

## IV.   Conclusion

For the foregoing reasons, the Court grants the Commerce's motion for summary judgment and denies Cause of Action's cross-motion for summary judgment.   An Order will be issued contemporaneously with this Memorandum Opinion.


DATE: January 14, 2021

CARL J. NICHOLS
United States District Judge